THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GINIO MERCADO, Defendant-Appellant.

Second District    No. 2—04—0817

Opinion filed March 30, 2005.

Michael T. Norris, of Law Offices of Michael T. Norris, of Schaumburg, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of Elgin, for the People.

JUSTICE McLAREN delivered the opinion of the court:

In October 2003, Rebeca Guijosa-Vanegas,[1] the pregnant ex-girlfriend of defendant, Ginio Mercado, accused defendant of kidnaping her from her home, chaining her to a bed, and sexually assaulting her. Based on these accusations, defendant was charged with four counts of aggravated criminal sexual assault (720 ILCS 5/12—14(a)(4) (West 2002)), two counts of criminal sexual assault (720 ILCS 5/12—13(a)(1) (West 2002)), three counts of kidnaping (720 ILCS 5/10—1(a)(2) (West 2002)), and two counts of unlawful restraint (720 ILCS 5/10—3(a) (West 2002)). Pursuant to a plea agreement, defendant pleaded guilty to two counts of aggravated criminal sexual assault and one count of kidnaping, in exchange for prison sentences totaling 17½ years. Approximately one month after defendant pleaded guilty, he moved to vacate his guilty plea, contending that Rebeca recanted her accusations of sexual assault. Attached to defendant's motion was a copy of Rebeca's affidavit, in which Rebeca stated that she and defendant had consensual intercourse and that defendant chained her to a bed to prevent her from attempting to hurt herself. At subsequent hearings on the motion, witnesses to the execution of the affidavit testified, confirming that Rebeca desired to recant her previous accusations. The trial court denied defendant's motion to withdraw his guilty plea, finding that the affidavit and the testimony supporting its authenticity were unreliable. This timely appeal followed (see 188 Ill. 2d R. 604(d)). We reverse and remand.

On May 3, 2004, the trial court, the State, and defendant's attorney engaged in a Supreme Court Rule 402 (177 Ill. 2d R. 402) conference. After that meeting, the trial court told defendant what was discussed during the conference, advising defendant that the risks were great for him if he decided to pursue a trial. The trial court also told defendant that it would not accept a sentence within the lower range of possible sentences, indicating that a sentence between 17 and 18 years was more appropriate. When the trial court asked defendant whether he had any questions concerning what was discussed,

---

[1]Throughout this disposition, we have spelled the victim's name Rebeca, as this is the spelling used in the indictments.

defendant asked only whether he was the father of the child recently born to Rebeca, advising the trial court that Rebeca had admitted as much to him.

Immediately thereafter, defendant agreed to plead guilty to two counts of aggravated criminal sexual assault and one count of kidnaping in exchange for a 17½-year sentence. In giving the factual basis for the plea, the State indicated that Rebeca would testify that she had a previous relationship with defendant but ended that relationship well before October 2003. Because defendant continued to give Rebeca attention after she ended their relationship, Rebeca, her child, and her current boyfriend moved.

On October 5, 2003, in the early morning, Rebeca, who was six months pregnant, left the home she shared with her boyfriend and her child to go to work. While she was outside her home attempting to get into her car, defendant grabbed her, forced her into his car, and drove her to his home in Vernon Hills. Once at defendant's home, defendant took Rebeca to his bedroom and tied her wrists to his bed with plastic ties. Rebeca repeatedly asked to be released, and defendant denied her requests. Defendant did cut the plastic ties so that Rebeca could use the bathroom, but he followed her until they returned to his bedroom. Once they returned, defendant locked his bedroom door, and Rebeca fell asleep without restraints on her wrists. Defendant then held Rebeca's wrists down next to her head and had sexual intercourse with her without her consent.

The next day, defendant bought a chain and lock, which he used to chain Rebeca to his bed. According to the State, defendant admitted to the police that he restrained Rebeca in this manner. After securing Rebeca with the chain and lock, defendant again had sexual intercourse with Rebeca against her will. Defendant then left for work, and Rebeca picked the lock on the chain and escaped.

Defendant stipulated that this testimony would comprise the evidence the State would present at a trial, indicating that such an acknowledgment did not mean that the allegations were true. The trial court accepted the plea, finding it knowingly and voluntarily entered and supported by a factual basis. The trial court also specifically stated that defendant pleaded guilty because he believed that it was in his best interest to accept the plea agreement. Although the trial court accepted the plea, it continued the proceedings for sentencing because no presentence investigation report (PSI) had been prepared and, without such a report, the trial court found that it could not sentence defendant for a felony.

Soon afterwards, a PSI was prepared. The presentence investigator indicated in the report that he did not talk with Rebeca, as she

advised the State's Attorney's office that she wished not to be contacted for purposes of preparing the report. The investigator also stated in the report that, according to defendant, defendant terminated his relationship with Rebeca because she began dating her old boyfriend. Three weeks after the relationship ended, Rebeca called defendant, informing him that she was pregnant with defendant's child and that she wanted to live with defendant. Defendant told Rebeca that she needed to "straighten out" her relationship with her boyfriend first. Rebeca continued to come to defendant's home, and, while at defendant's home on the day of the incident, she began "acting crazy like she was going to hurt herself." To prevent Rebeca from harming herself, defendant restrained Rebeca to his bed and attempted to contact Rebeca's family so that they could help her. Defendant denied sexually assaulting Rebeca.

Within four days after the PSI was filed, the State filed a sexual offender treatment program report and a psychological evaluation. In the sexual offender report, Rebeca's version of events was consistent with the factual basis the State gave when defendant pleaded guilty, while defendant's rendition was consistent with what he told the presentence investigator. However, defendant advised the sexual offender evaluator that Rebeca consented to having sex with defendant on October 5 and 6 and that Rebeca had prepared an affidavit recanting her accusations. In the psychological report, the evaluator relied on the PSI in reporting Rebeca's claims. The psychological evaluator indicated that defendant pleaded guilty, despite his innocence, because the trial judge threatened to impose a lengthy sentence if defendant pursued a trial.

On June 15, 2004, defendant moved to withdraw his guilty plea. Attached to the motion was Rebeca's affidavit, which provided as follows:

> "I, Rebecca [sic] Guijosa, certify that the following statement is true and correct and that my statement was made by myself under my own free will. I am in my own straight of mind.
>
> On October 5, 2003[,] I willingly went with my boyfriend, [defendant], in his car to his townhouse in Vernon Hills, IL. We had consentual [sic] sex that day as we have had many times in the past. He did that next day leave me chained to the bed because during our discussion I had told him about hurting or killing myself because I was pregnant. They were small chains and locks that I was easily able to get out of. I wish to remove all charges from [defendant]. Rebecca [sic] Guijosa"

The affidavit was notarized on May 17, 2004, by Bertha Vargas, who indicated that "Rebeca Guijosa" proved her identity with a "Mexican

Matricula I.D." The affidavit was also witnessed by "M. Ricardia Cornejo." Both the notary and the witness signed their names, while Rebeca's name was printed.

On July 9, 2004, defendant filed an amended motion to withdraw his guilty plea. Attached to the amended motion was defendant's affidavit and a copy of Rebeca's affidavit. In his affidavit, defendant stated that he pleaded guilty because he believed that Rebeca would testify that she did not consent to sexual intercourse, that defendant kidnaped her, and that defendant held her against her will and without good cause. Defendant also stated that, before he pleaded guilty, his prior and current attorneys sent investigators to speak with Rebeca about the charges. Rebeca refused to speak with any of these investigators.

At the hearing on the amended motion to withdraw defendant's guilty plea, defendant's sister, Marina Ortiz, testified that on May 16, 2004, at around 12:30 p.m., she and her brother Jose Mercado went to speak with Rebeca at her place of employment. During Marina's conversation with Rebeca, Marina sat in Rebeca's car because Rebeca said, "[I]f my boyfriend comes and sees you standing here, then he is going to think something is up." In the backseat of Rebeca's car were two small children. Marina learned that defendant was the father of one of those children. While sitting in Rebeca's car, Rebeca and Marina discussed Rebeca contacting defendant's attorney. Based on everything that happened that day, Rebeca asked Marina to return the following day.

On May 17, 2004, Marina returned with her sister, a notary public, and a witness. Marina testified that her sister, Maria Ortiz, arranged for the presence of the notary and the witness. Marina observed either the notary or the witness speaking with Rebeca, and Marina saw Rebeca, the notary, and the witness sign the affidavit.

On cross-examination, Marina testified that she had talked with defendant about where Rebeca worked, but defendant did not ask her to go speak with Rebeca. Rather, Marina wanted to talk to Rebeca because she wanted to know whether defendant was the father of the child recently born to Rebeca. During Rebeca and Marina's conversation that day, which was in Spanish, Rebeca suggested retaining a notary public and a witness because she wanted to drop the charges against defendant.

On May 17, when the affidavit was prepared, Marina did not observe the witness, whom she had seen only once before, speak English, indicating that the witness told her that she did not speak English. Marina was unsure whether the notary or the witness wrote the affidavit because, having met those women only once, she was not

sure which woman was the notary and which one was the witness. However, Marina later testified that the notary wrote the affidavit. As Rebeca spoke in Spanish, the notary wrote Rebeca's statement in English. Marina heard Rebeca state everything that is in the affidavit, and Marina testified that the affidavit truly and accurately reflects what Rebeca said that day. Once the affidavit was completed, the notary read it back to Rebeca in Spanish.

The trial court denied defendant's motion to withdraw his guilty plea, finding that the affidavit was unreliable hearsay and not newly discovered evidence because, if Marina could find Rebeca and obtain an affidavit, then that same information was available to defendant long before he pleaded guilty. The trial court also found Marina incredible, noting that Rebeca, who does not speak English, allegedly "signed" her name in English, spelling her name "Rebecca." Further, the trial court believed that the language used in the affidavit was not "something someone even in the Spanish language would state so it could be interpreted that way in the English language." Lastly, the trial court noted that defendant did not call Rebeca, the notary, or the witness to testify.

Six days later, defendant again moved to withdraw his guilty plea, asking the trial court to consider testimony from Manuelita Cornejo, the witness to the affidavit. Before hearing that testimony, the trial court questioned Officer Andy Jones, whom Rebeca contacted within the last six days after defendant's attorney sent defendant's relatives and others to talk with Rebeca at her place of employment. Defendant's attorney admitted that he sent Cornejo to get an affidavit in Spanish from Rebeca because the trial court had found the English affidavit insufficient. Officer Jones, who was not under oath, told the trial court that Rebeca did not wish to speak with anyone from defendant's family or his attorney's office. In his discussions with Rebeca, Rebeca admitted to Officer Jones that the "three women who *** talked to her during the statement in her parking lot at work" returned to her place of employment. Over the State's objection, the trial court then allowed defendant to present Cornejo's testimony.

Manuelita Ricardia Cornejo testified that she does tax work and also works as an interpreter and notary public. Cornejo stated that she knows Maria Ortiz, Marina and defendant's sister, but she is more familiar with Maria's husband, having done tax, immigration, and notary work for him. On May 17, 2004, Cornejo and her sister, Bertha Vargas, who is also a notary public, accompanied Maria and Marina to Rebeca's place of employment.

Once at Rebeca's place of employment, Cornejo met Rebeca, who showed Cornejo identification. Cornejo wrote down in English what

Rebeca told her in Spanish. When Rebeca asked Cornejo to read the affidavit to her, Cornejo complied, reading the affidavit out loud in Spanish. Cornejo signed the affidavit, she observed both Vargas and Rebeca sign the affidavit, and she saw Vargas put her notary stamp on the document. Cornejo noticed that, when Rebeca signed her name, she spelled her name with either one less or one more "c" than Cornejo initially believed. Cornejo questioned Rebeca about the discrepancy and looked at Rebeca's identification. Rebeca told Cornejo that her name was misspelled on her identification card.

On cross-examination, Cornejo testified that Maria hired her as an interpreter, but Cornejo also witnessed the making of the affidavit. Maria told Cornejo that she needed someone to assist in translating some information onto paper and notarizing that information, telling Cornejo that her services were wanted for something having to do with defendant. Cornejo was paid $80 for her two hours of service.

When the four women arrived at Rebeca's work, they remained in their cars for 30 to 45 minutes in a place that was very visible. When Rebeca left work that day, Marina approached her. Cornejo indicated that Rebeca looked as if she was expecting defendant's family, saying that Rebeca's encounter with Marina "looked pleasant." After about 10 minutes, Cornejo joined Marina and Rebeca. When Cornejo spoke with Rebeca, whom she had never met before, they spoke only Spanish. As Rebeca spoke in Spanish, Cornejo wrote the affidavit in English, believing that writing the affidavit in English was the correct procedure. In looking at the affidavit, Cornejo testified that she wrote "I, Rebecca [sic]," that Rebeca signed her name "Rebecca [sic]," and that Vargas filled in "Rebeca" in her notary signature block.

The trial court then posed several questions to Cornejo. During the court's inquiry, Cornejo testified that, having prepared affidavits previously and knowing what form they should take, she asked Rebeca a series of questions, the answers to which comprised the first paragraph of the affidavit. For example, Cornejo asked Rebeca if she was making the statement of her own free will. Cornejo acknowledged that, when she asked Rebeca if she was "straight of mind," she had to ask, in Spanish, whether Rebeca was "sane," as there is no closer translation.

In writing the second paragraph of the affidavit, Cornejo testified that Marina asked questions in English that Cornejo immediately translated in Spanish and asked Rebeca. Once Rebeca gave an answer, Cornejo told Rebeca what she was going to write in the affidavit, and Cornejo asked Rebeca whether she wanted that statement in the affidavit. For instance, Marina asked whether Rebeca had consensual sex that day as she had many times in the past, Cornejo translated

that question in Spanish to Rebeca, Rebeca said yes, and Cornejo wrote in English Rebeca's response. As to the last sentence in the affidavit, Cornejo testified that Rebeca said that she "want[ed] all of this stuff to be taken away from [defendant]," noting that Rebeca appeared frustrated, not pressured, when she made that statement. Cornejo clarified that Rebeca appeared frustrated because it was hot outside and she needed to retrieve her children from day care.

Once the affidavit was written, Cornejo read the affidavit in Spanish to Rebeca. Vargas then joined Cornejo, Rebeca, and Marina, read the affidavit, looked at Rebeca's identification, and had Rebeca sign the affidavit.

The trial court again denied defendant's motion to withdraw his guilty plea, finding that Rebeca was "confronted" and under duress when the statement was made. The trial court also found Cornejo incredible because she "first tried to describe it as that *** is what [Rebeca] said and [Cornejo] wrote it down. And then when [the trial court] tried to clear that up with her, [Cornejo] indicated that [Marina] asked specific questions and [Cornejo] wrote down the answer[s]." The trial court also found that Rebeca's testimony would be critical, noting that the affidavit is in English and that Rebeca does not speak English. Further, the trial court reiterated that defendant failed to establish that he lacked prior knowledge of the evidence or that he used due diligence in obtaining such evidence. The trial court then imposed the agreed sentence, and this timely appeal followed.

■ The issue raised on appeal is whether the trial court erred when it denied defendant's motion to withdraw his guilty plea. A defendant has no absolute right to withdraw a guilty plea. *People v. Artale*, 244 Ill. App. 3d 469, 475 (1993). Rather, in order to withdraw a guilty plea, a defendant must establish a recognized basis for such withdrawal. See *People v. Wilson*, 295 Ill. App. 3d 228, 236 (1998). Specifically, a defendant may withdraw a guilty plea "[w]here it appears that the plea of guilty was entered on a misapprehension of the facts or of the law, or in consequence of misrepresentations by counsel or the State's Attorney or someone else in authority, or the case is one where there is doubt of the guilt of the accused, or where the accused has a defense worthy of consideration by a jury, or where the ends of justice will be better served by submitting the case to a jury." *People v. Morreale*, 412 Ill. 528, 531-32 (1952). We review a trial court's ruling on a motion to withdraw a guilty plea under an abuse of discretion standard. *People v. Jamison*, 197 Ill. 2d 135, 163 (2001).

■ It is well settled that a defendant may not withdraw his guilty plea if he has misjudged the strength of the State's case. *People v. Frascella*, 81 Ill. App. 3d 794, 797-98 (1980); *People v. Jones*, 74 Ill.

App. 3d 243, 246 (1979); *People v. O'Connor*, 37 Ill. App. 3d 310, 313 (1976). However, believing that the State has evidence with which to obtain a conviction is diametrically different from misevaluating the strength of the State's case. We believe that this case falls into the former category, and, thus, we determine that the trial court abused its discretion when it denied defendant's motion to withdraw his guilty plea. In reaching this conclusion, we find instructive *State v. Fritz*, 157 Ariz. 139, 755 P.2d 444 (App. 1988).

In *Fritz*, the defendant pleaded guilty to attempted sexual conduct with a minor in the second degree. *Fritz*, 157 Ariz. at 139, 755 P.2d at 444. A few months after the defendant was sentenced, he petitioned for postconviction relief, informing the court that the alleged victim recanted his accusations. After an evidentiary hearing, the trial court granted the defendant's petition, and the State appealed. On appeal, the court affirmed, noting:

"If the sole basis for the strength of the state's case is the credibility of the victim, as is usually the case in non-witnessed sexual assaults, and the defendant's plea is based upon the supposition that the victim will be believed, then it appears in the interest of 'manifest justice' that when the victim's credibility is called into question by a recantation, the trial court does not abuse its discretion by allowing a plea to be withdrawn in order that the victim's credibility be tested in the crucible of trial." *Fritz*, 157 Ariz. at 141, 755 P.2d at 446.

Here, as in *Fritz*, Rebeca would provide the only testimony about what happened on those two days in October 2003. Although the State indicated at one point in presenting its factual basis that a police officer would testify, this testimony was related to defendant admitting that he bought a chain and lock to chain Rebeca to the bed, a fact that defendant has never denied. Moreover, in line with *Fritz*, defendant claimed that he pleaded guilty because he believed that Rebeca would testify consistently with her accusations. Although we recognize that recantation evidence is inherently unreliable (see *People v. Steidl*, 142 Ill. 2d 204, 253-54 (1991)), we cannot conclude that it may never serve as a basis to withdraw a guilty plea. Rather, when the witness who provides the only evidence against the defendant recants, the defendant should be allowed to test that witness's credibility at trial. Here, because Rebeca is the linchpin in the State's case against defendant, her credibility is of the utmost importance, and the affidavit, which raises questions about Rebeca's credibility, cannot be ignored.

Clearly, the trial court disregarded Rebeca's affidavit and the evidence supporting it. Although there were discrepancies in the wit-

nesses' testimony, no evidence contradicted defendant's evidence, and the trial court erred when it disregarded that uncontroverted evidence. See *Urban v. Industrial Comm'n*, 34 Ill. 2d 159, 163 (1966) (trial court cannot disregard uncontradicted facts and unimpeached testimony); see also *People v. Powell*, 107 Ill. App. 3d 418, 421 (1982).

When the trial court denied defendant's motion to withdraw his guilty plea, it stressed four main factors on which it relied. Specifically, the trial court (1) doubted that Rebeca was a party to the affidavit or signed it, (2) believed that Rebeca was under duress if she did sign the affidavit, (3) found Cornejo incredible, and (4) determined that defendant was not diligent in obtaining the affidavit. We address each factor in turn.

First, the trial court questioned whether Rebeca "signed" the affidavit, noting that her name was printed and, perhaps, misspelled. However, both Marina and Cornejo testified in great detail about how the document was prepared, and even Officer Jones, whom the State called for an unrelated matter, indicated that Rebeca met with the women and prepared a statement. Marina and Cornejo also stated that they saw Rebeca sign the affidavit, which Vargas notarized and Cornejo signed as a witness. Cornejo explained that Rebeca's name was misspelled on her identification, which was the spelling that Vargas, who was not present when Rebeca made her statement, used in notarizing the affidavit.

The trial court also found that Rebeca was under duress when she signed the affidavit, but nothing in the record supports this conclusion. Marina testified that she never initiated contact with Rebeca because she, defendant, or anyone in defendant's family wanted Rebeca to recant her accusations. Rather, Marina wished to speak with Rebeca because she wanted to know whether defendant was the father of the child recently born to Rebeca, the answer to which was also important to defendant. Further, Cornejo testified that when she and the other three women went to Rebeca's place of employment, they parked in a place highly visible to those entering or exiting the building. When Rebeca left the building, she willingly met with Marina, whom she had told to meet her there that day. At one point during the meeting, Cornejo stated that Rebeca appeared frustrated, but Rebeca was acting that way because it was warm outside and she needed to retrieve her children from day care. Certainly, this frustration was not duress that Cornejo, Vargas, or anyone in defendant's family created.

Moreover, the trial court found that Cornejo was incredible because she changed her testimony about how the affidavit was prepared. We disagree. Cornejo consistently stated that the affidavit contained Rebeca's statements. Cornejo testified that she wrote in English what

Rebeca told her in Spanish, reading the affidavit in its entirety to Rebeca once the statement was complete. Before the court posed questions to Cornejo, neither attorney asked Cornejo whether, in preparing the affidavit, Rebeca was responding to questions or providing a narrative that Cornejo translated into English. Although a trial court certainly bears the burden of assessing the credibility of witnesses who testify at a hearing on a motion to withdraw a guilty plea (see, e.g., *People v. Petrovic*, 146 Ill. App. 3d 857, 861 (1986)), any negative assessments, when premised on discrepancies in a witness's testimony, must be based on actual inconsistencies.

Lastly, the trial court found that defendant was not diligent in obtaining Rebeca's affidavit. We again disagree. The uncontradicted testimony revealed that Rebeca would not speak with either one of defendant's attorneys, who tried to investigate further Rebeca's claims. Although this evidence, which came from defendant's affidavit, appears self-serving, it is supported to a certain extent by the fact that Rebeca would not speak with the PSI investigator. If she would not speak with agents of the State, it seems unlikely that she would talk with anyone representing defendant. Once defendant learned that Rebeca recanted, he timely moved to withdraw his guilty plea. This evidence, coupled with the fact that defendant could not have done anything to precipitate Rebeca's recantation (see *State v. D.T.M.*, 78 Wash. App. 216, 221, 896 P.2d 108, 111 (1995)), leads us to conclude that defendant did act diligently.

In reaching our conclusion that the trial court abused its discretion in denying defendant's motion to withdraw his guilty plea, we stress that not every defendant who wishes to withdraw a guilty plea may do so if affidavits are presented indicating that the victim wishes to recant. See *State v. Moore*, 99 Ohio App. 3d 748, 755-56, 651 N.E.2d 1319, 1324 (1994) (three identical affidavits, which were signed by the defendant's relatives, prepared by the same person, and contained hearsay statements about what the defendant's attorney allegedly said to the defendant, could not contradict court record that revealed that the defendant's guilty plea was knowingly and voluntarily entered); *In re Crabtree*, 141 Wash. 2d 577, 588, 9 P.3d 814, 820 (2000) (the defendant could not withdraw his guilty plea based on affidavit from child whom the defendant sexually assaulted because, among other things, the affidavit was submitted nine years after the defendant pleaded guilty and other evidence established the defendant's guilt). Rather, the trial court must still exercise its discretion and determine whether a proper basis exists to withdraw the plea. Although there is no requirement in Illinois, as there is in other states, that a defendant must present evidence corroborating the recantation evidence in a

guilty plea case (see, *e.g.*, *State v. McCallum*, 208 Wis. 2d 463, 476-78, 561 N.W.2d 707, 711-12 (1997)), we believe that such corroborating evidence, or lack thereof, may be insightful. Factors that may be pivotal in cases such as this one include, but are not limited to, when the victim recants in relation to when the defendant is convicted and sentenced, whether the affidavit is from the victim or the defendant's relatives, what motive the victim had to make the initial accusations, and whether the defendant has repeatedly claimed that he is innocent.

A consideration of these factors lends further strength to our determination that the trial court abused its discretion when it denied defendant's motion to withdraw his guilty plea. First, 14 days after defendant pleaded guilty, and before the sentence was imposed, Rebeca's affidavit was prepared. Defendant moved to withdraw his guilty plea 29 days later. This is far different from the nine-year delay in *Crabtree*. Second, the affidavit is from Rebeca, the victim, making this matter a stronger case for reversal than the three affidavits prepared by the defendant's family in *Moore*.

Third, Rebeca may have had a motive to falsely accuse defendant. See *McCallum*, 208 Wis. 2d at 478, 561 N.W.2d at 712-13 (noting that victim's motive to falsely accuse the defendant, which was unknown to the trial court when defendant pleaded guilty, corroborated the victim's recantation, and, thus, gave recantation evidence credibility). Here, when Rebeca was at defendant's home on October 5 and 6, 2003, she was living with an old boyfriend, who apparently would come by Rebeca's place of employment and would be suspicious if he saw Rebeca talking with one of defendant's sisters. In October 2003, Rebeca was six months pregnant with a child whose father could be defendant. These facts suggest that Rebeca may have lied about what happened in October 2003 because, at a minimum, she did not want to upset the old boyfriend with whom she then lived. Although the above may be the reason for Rebeca's actions, we do not suggest that this theory is true. We merely indicate that, based on the evidence presented, Rebeca may have had a basis to falsely accuse defendant of various crimes and later recant those accusations.

Fourth, we find important the fact that defendant repeatedly professed his innocence. See *People v. De Jesus*, 606 N.Y.S.2d 255, 257, 199 A.D.2d 529, 531 (1993) (determining that the defendant, who pleaded guilty to endangering the welfare of a child and later moved to withdraw the plea when the child recanted her accusations, should be allowed to withdraw his guilty plea based on the recantation evidence and the fact that the defendant repeatedly and adamantly asserted his innocence). For example, here, when defendant pleaded guilty, the trial court took the time to specifically advise defendant

that by stipulating to the evidence the State would present at trial, defendant did not thereby agree that the events actually happened as the State claimed. Rather, the trial court explained that defendant pleaded guilty because he believed that taking advantage of the State's offer was advantageous. Preceding these admonishments was the trial court's statement to defendant that the risks were great for him if he decided to pursue a trial, which may have given defendant an additional incentive to plead guilty despite his belief that he was innocent. Moreover, when defendant was interviewed for the PSI, the sexual offender treatment program, and the psychological evaluation, he told all three investigators that he did not sexually assault Rebeca, that the sexual intercourse was consensual, and that he restrained Rebeca because he wanted to prevent her from harming herself. This evidence, coupled with Rebeca's affidavit, convinces us that defendant should be allowed to withdraw his guilty plea. See *De Jesus*, 606 N.Y.S.2d at 257, 199 A.D.2d at 531.

In conclusion, we hold that the ends of justice are better served by allowing defendant to withdraw his guilty plea and pursue a trial. In reaching this result, we must note that our decision has no bearing on defendant's success in further proceedings. Rather, by allowing defendant to withdraw his guilty plea, we merely are affording him an opportunity to test at trial the credibility of Rebeca, the State's only witness. *Fritz*, 157 Ariz. at 141, 755 P.2d at 446.

For these reasons, the judgment of the circuit court of Lake County is reversed, and this cause is remanded for further proceedings.

Reversed and remanded.

HUTCHINSON and BYRNE, JJ., concur.