# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #030

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **27th day of June, 2018**, are as follows:

**BY CRICHTON, J.**:

2016-KP-1708    STATE OF LOUISIANA v. CATINA  CURLEY (Parish of Orleans)

This case presents the question of whether the defendant was deprived of effective assistance of counsel where trial counsel failed to investigate and present a cogent defense of "battered woman's syndrome" ("BWS"), including failing to investigate the benefits of expert testimony concerning BWS. We hold that the defendant was deprived of effective assistance of counsel in this case, given the documented evidence of repeated abuse the victim perpetrated upon the defendant before his death. We therefore reverse the court of appeal, vacate the defendant's conviction and sentence, and remand to the trial court for further proceedings consistent with this opinion.

REVERSED; CONVICTION AND SENTENCE VACATED; REMANDED.

WEIMER, J., dissents and assigns reasons.

SUPREME COURT OF LOUISIANA

No. 2016-KP-1708

STATE OF LOUISIANA

VERSUS

CATINA CURLEY

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FOURTH CIRCUIT, PARISH OF ORLEANS

**CRICHTON, Justice**

This case presents the question of whether the defendant was deprived of effective assistance of counsel where trial counsel failed to investigate and present a cogent defense of "battered woman's syndrome" ("BWS"), including failing to investigate the benefits of expert testimony concerning BWS. We hold that the defendant was deprived of effective assistance of counsel in this case, given the documented evidence of repeated abuse the victim perpetrated upon the defendant before his death. We therefore reverse the court of appeal, vacate the defendant's conviction and sentence, and remand to the trial court for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

Renaldo and Catina Curley, married for approximately nine and a half years, lived in a New Orleans residence with their children: Renaldo Boykin, Renaldo Curley's son from a prior relationship; Develon and Brittany Espadron, Catina Curley's children from a prior relationship; and April and Devon Curley, the couple's biological children.[1] At trial, the state presented the testimony of seven

---

[1] For purposes of clarity, Catina Curley is hereinafter referred to as "Curley" or "defendant," and Renaldo Curley is referred to as "victim."

1

witnesses, and the defense called 13 witnesses, including defendant.[2] The evidence revealed that, on March 30, 2005, the evening of the shooting, the victim and defendant were living apart in a temporary separation. Defendant had been living with her mother for several days while the victim remained in the family's home with their children. That evening, the victim was at the home with four of the children, defendant's cousin, and a neighbor. Defendant testified that she called her house to check on her children, and spoke on the phone with one of her children, Brittany. After hearing from Brittany about the presence of guests, she returned home, entered, and ordered the cousin and neighbor to leave.

After the cousin and neighbor left, defendant proceeded upstairs to retrieve clothes from her second floor bedroom. The victim followed her upstairs and subjected her to verbal and physical violence, including arguing and cursing at her, throwing a soda can at her, and threatening additional violence.[3] At some point, the victim left the bedroom and returned to the downstairs living room. Soon after, defendant also went downstairs, but before doing so, she armed herself with a handgun the victim kept under their mattress. She testified that she needed the weapon to protect herself. The exit door was located somewhere near the foot of the stairwell, but defendant had apparently placed her car keys on a table in the living room when she entered the home. There are varying accounts of what happened next, but there is no dispute that the weapon in defendant's hand ultimately discharged, sending a single bullet into the victim's chest and killing him.

---

[2] The facts of that evening, as set forth at trial, are described more fully in the opinion of the court of appeal on direct review. *State v. Curley*, 08-1157 (La. App. 4 Cir. 5/12/10), 2010 WL 8966072, *writ denied*, 10-1674 (La. 1/28/11), 56 So. 3d 967.

[3] Among other testimony, defendant stated the victim was cursing and stated: "Bitch, you going to make me hurt you." She was "telling him to stop" but he just "kept coming and coming." She testified: "I was very frightened. I was scared, I mean, really delirious."

2

The State indicted Curley for second degree murder on August 4, 2005. La. R.S. 14:30.1(A)(1). At her arraignment, she pleaded not guilty, but subsequently withdrew her former plea and entered a dual plea of not guilty and not guilty by reason of insanity (NGBRI). As a result of Hurricane Katrina, Curley's trial was delayed. In February 2007, two days before trial was to commence, Curley's new post-Katrina counsel, John Fuller, appeared in court with Curley present, withdrew the dual plea, and entered a plea of not guilty. Despite extensive testimonial and documentary evidence regarding abuse the victim perpetrated upon defendant, trial counsel did not educate himself on the method by which BWS evidence should be introduced at trial, nor did he consult with an expert or seek to introduce expert testimony regarding BWS and its effects. Instead, trial counsel presented alternative theories of justification and accidental discharge.

Though testimony regarding the facts of what transpired on the night of the shooting was disputed, there was no such confusion with respect to the physical abuse the victim perpetrated upon defendant over a period of many years. The defense presented testimonial and documentary evidence of multiple prior instances of physical abuse. Among other testimony, New Orleans Police Department Detective Scott Melia testified to at least six police reports detailing domestic violence dating back to 1995 involving defendant and the victim and, in one instance, one of the children.

Defense counsel called Brittany Espadron, defendant's biological daughter and the victim's stepdaughter. She testified that she could not count how many times she had seen the victim hit defendant and Renaldo Boykin. Brittany also indicated that the victim had beaten her and her little brother Devon in the past and had also choked her. Devon Curley, the biological son of defendant and the victim, who was "nine or ten years old" when the shooting occurred, testified that he had seen and

heard about the victim hitting both defendant and Renaldo Boykin in the past. Further, the victim had hit him and "slammed" him "a lot." Devon also used the phrase "a lot" when he was asked how often the victim beat defendant.

Herman Benton, defendant's former supervisor at Walmart, where defendant worked from approximately 2002-2005, testified that defendant called in "numerous times" to say she could not come to work. Benton recalled one particular incident when he required defendant to come in to prove why she could not be at work that day. When she showed up, defendant had what Benton described as "trauma" to her entire facial area; her forehead, eyes, and cheeks were all swollen. Defendant described to him that she had been involved in a physical altercation with her husband. Without detailing them specifically, Benton further testified that he had observed defendant with other facial injuries.

Finally, defendant herself testified and detailed the abuse she suffered at the hands of the victim. She described that the victim had broken her nose in 2002 or 2003 while she was working at Walmart. The broken nose caused bruises to both sides of her face, blackened her eyes, and caused them to swell shut. She also described that the victim once threw her to the ground and kicked her in the shoulder, dislocating it. She stated that the victim would not let her report or seek treatment for this injury, blocking the door and pulling the phone out of the wall, and she still suffered from shoulder problems at the time of trial. Defendant further described a particular incident where the victim allegedly tried to push her from a moving car.[4]

---

[4] On cross-examination, the state asked defendant why there were no police reports detailing any abuse from between 1999 and 2005. She stated she did not know, as she called the police several times during those years, including when her nose was broken in 2002 or 2003 and someone from the hospital placed the call for her. The defense presented the testimony of an investigator and former NOPD detective who attempted to corroborate some of defendant's additional claims of abuse by securing her medical and psychiatric records, but they had apparently been lost in Hurricane Katrina.

4

Defendant testified that she could not always call the police when the victim abused her because the victim would sometimes break the phone or keep her from leaving the house. Therefore, she stated that the police reports did not tell of every time the victim abused her. Defendant indicated that she stayed with the victim because she loved him and had a desire to make their marriage work despite her belief that he had a "sickness." She indicated that she had tried to leave in the past but always ended up returning, though the beatings were beginning to become "overwhelming." While defendant admitted that she sometimes fought back to defend herself from the victim, she estimated that he was the aggressor 95% of the time.

Only a single witness testified that the victim never abused defendant: Renaldo Boykin, the victim's biological son and defendant's stepson, who was 12 years old at the time of the shooting. Despite the testimony set forth above to the contrary, Boykin stated that he had never witnessed nor known the victim to hit defendant.

After a multi-day trial, an Orleans Parish jury returned a verdict of guilty as charged, and the trial court sentenced defendant to life imprisonment at hard labor "without benefit." The court of appeal affirmed the conviction and sentence. *State v. Curley*, 08-1157 (La. App. 4 Cir. 5/12/10), 2010 WL 8966072, *writ denied*, 10-1674 (La. 1/28/11), 56 So. 3d 967.

Defendant filed a timely pro-se application for post-conviction relief, followed by a counseled supplemental memorandum alleging ineffective assistance of counsel for, *inter alia*, (i) withdrawing the NGBRI plea without first having defendant psychologically evaluated, and (ii) failing to educate the jury on the effects of domestic violence, particularly BWS. The district court held a hearing where defendant's trial counsel, John Fuller, testified.

5

Most of the testimony at the post-conviction hearing related to Fuller's withdrawal of defendant's NGBRI plea. Fuller admitted that he did not consult with defendant before withdrawing the NGBRI plea. He testified that he withdrew the NGBRI plea based on his belief that an insanity defense was suggestive of a "paranoid schizophrenic or whatever." He stated that he did not "take into account relative to a not guilty by reason of insanity [plea] the opportunity to present a battered spouse expert." He further testified that he was unaware of prohibitions of introducing certain types of psychological evidence absent a NGBRI plea, and thought that the NGBRI plea was "inappropriate for a self-defense defense." Related to the self-defense claim he ultimately pursued, Fuller testified that he did not know that he could introduce expert testimony concerning BWS under a "not guilty" plea at all. Putting aside funding issues, he confessed to "ignorance" related to a BWS expert. He also believed a self-defense claim based on a prior history of abuse was "obvious" and that, in retrospect, "I should have talked to or at least conferred with a battered spouse expert." He stated that the "twelve years worth of abuse" that defendant suffered was "probably the worst [he'd] ever seen," so he found no reason at the time to consult an expert.

The trial judge, who also presided over Curley's original trial, granted relief and ordered a new trial, reasoning that BWS evidence is admissible to refute specific intent only when raised under a NGBRI plea. Citing *Strickland v. Washington*, 466 U.S. 668 (1984), the court held that defendant was deprived of effective assistance of counsel in violation of her Sixth Amendment right by withdrawing the dual plea and failing to present expert testimony concerning BWS.

The court of appeal reversed and reinstated defendant's conviction and sentence. It found Fuller's decision to withdraw the NGBRI plea to be a strategic decision. The court also found that defendant failed to demonstrate prejudice under

*Strickland* by making a showing that "even had counsel not withdrawn the plea and had hired an expert in battered wife syndrome, that expert would have found that respondent suffered from that syndrome to the extent that it negated her ability to distinguish right from wrong." *State v. Curley*, 16-0604, p. 3 (La. App. 4 Cir. 8/12/16) (unpublished). This Court thereafter granted defendant's writ application. *State v. Curley*, 16-KP-1708 (La. 2/23/18), 236 So. 3d 1257.

## DISCUSSION

"The Sixth Amendment, applicable to the States by the terms of the Fourteenth Amendment, provides that the accused shall have the assistance of counsel in all criminal prosecutions." *Missouri v. Frye,* 566 U.S. 134, 138 (2012). *See also State v. Thomas*, 12-1410, p.5 (La. 9/4/13), 124 So. 3d 1049, 1053. The United States Supreme Court has long recognized that the right to counsel is the right to the "effective assistance of counsel." *Frye*, 566 U.S. at 138. Claims of ineffective assistance of counsel are generally governed by the standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), adopted by this Court in *State v. Washington*, 491 So. 2d 1337 (La. 1986).

To prevail on a claim of ineffective assistance, a defendant must first show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error has no effect on the judgment." *Id.* at 691. *See also Buck v. Davis*, -- U.S. --, 137 S. Ct. 759, 775-77 (2017) (explaining two prongs of *Strickland*). To satisfy the second prong of *Strickland*, a litigant must also demonstrate prejudice. "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the

7

defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 691-92. Thus, the "defendant must [also] show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The *Strickland* Court further explained that in making a determination of ineffectiveness of counsel, "[i]n every case the Court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696. *See also Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is reasonably likely the result would have been different.") (internal citations and quotation marks omitted). "[T]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

There is little dispute that the defendant in this case suffered a years-long course of abuse at the victim's hands. Trial counsel elected to argue self-defense predicated upon BWS, but without indicating any understanding of BWS (indeed, with a professed "ignorance" to important aspects of a BWS defense) and without undertaking any investigation at all of what expert resources might be available to him. We find that his representation, in its entirety, deprived defendant of effective assistance of counsel.

8

# I.

The first *Strickland* consideration is whether trial counsel's failure to conduct any investigation into the proper presentation of a BWS defense in this case, specifically including both his professed "ignorance" of the defense and the failure to investigate the benefit of expert testimony specifically, constituted deficient performance. In *Strickland*, the Supreme Court explained:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, ***counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary***. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91 (emphasis added).

In the present case, the court of appeal held that defendant did not meet her burden of demonstrating ineffective assistance of counsel under *Strickland*. The court of appeal specifically noted that defendant "failed to show that even had counsel not withdrawn the plea and had hired an expert in battered wife syndrome, that expert would have found that the respondent suffered from that syndrome to the extent that it negated her ability to distinguish right from wrong." Thus, the court of appeal ruling narrowly focused on defense counsel's withdrawal of the dual plea of not guilty and NGBRI, pointing out that Louisiana has not historically considered psychological evidence absent an insanity defense, and effectively presupposing that BWS is only relevant in the "insanity" context.[5] This was error in several respects.

---

[5] The trial court similarly found—without citing any authority—that BWS is a "mental defect that shows the state of mind of the defendant at the time of the alleged defense."

# A.

The Louisiana Code of Evidence prohibits the introduction of evidence of "a person's character or a trait of his character . . . for the purpose of proving that he acted in conformity therewith on a particular occasion." La. C.E. art. 404(A). The Code likewise prohibits the introduction of evidence of "other crimes, wrongs, or acts" in order to "prove the character of a person in order to show that he acted in conformity therewith." La. C.E. art. 404(B). However, those prohibitions are not absolute. As is relevant here, the Code provides express exceptions for the admission of evidence in circumstances where, as here, there is "a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship." La. C.E. arts. 404(A)(2)(a), (B)(2). Though the Code does not identify the exceptions with a particular term of art, we will refer to them herein as the "domestic battery exceptions."

La. C.E. art. 404 provides:

**A. Character evidence generally.** Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible in a civil or criminal proceeding for the purpose of proving that he acted in conformity therewith on a particular occasion, except: . . . .

The domestic battery exceptions state, in pertinent part:

**(2) Character of victim.** (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; provided further that *when the accused pleads self-defense* and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, *it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim*, including specific instances of conduct and domestic violence; *and further*

10

*provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible* . . . .

La. C.E. art. 404(A)(2)(a) (emphasis added).

**B. Other crimes, wrongs, or acts.**

(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible; provided that **when the accused pleads self-defense** and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, *it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim*, including specific instances of conduct and domestic violence; *and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible*.

La. C.E. art. 404(B)(2) (emphasis added).

The domestic battery exceptions apply, by their plain language, "when the accused pleads self-defense." Yet, as this Court has previously noted, this statutory language is a linguistic oddity, because the only pleas authorized by the Code of Criminal Procedure are guilty, not guilty, not guilty and not guilty by reason of insanity, and nolo contendere. La. C.Cr.P. art. 552. *See also State v. Rodrigue*, 98-1558, p.5-6 (La. 4/13/99), 734 So. 2d 608, 611. Self-defense is not a plea at all, but is "a defense based on justifiable conduct, in the nature of an affirmative defense, which defeats culpability." *Rodrigue*, 98-1558, p.5, 734 So. 2d at 611 n.2 (citing R.S. 14:19). Because the statutory language must have some meaning, and it is the function of the Court to give a genuine construction to the language, in *Rodrigue* we interpreted the domestic battery exception of art. 404(A)(2)(a) to apply where the

11

defendant relies on "self-defense as a defense to the prosecution." 98-1558, p.6, 734 So. 2d at 611 (citing R.S. 14:3).[6]

These articles therefore contemplate, on their face, the introduction of domestic battery evidence in a self-defense context. *See also* Force & Rault, *Handbook on La. Evid. Law*, Author's Note (2) to art. 404(A), pp. 554-55 (West 2017) ("The proviso noted in Article 404(A)(2) for cases in which the accused pleads self-defense and meets the other qualifications of the proviso . . . was designed to provide a certain measure of relief for defendants in the so-called 'battered wife' cases. . . . It provides what may prove to be a broad exception to Article 404(A) ***in many self-defense cases*** . . . ."). A "self-defense defense" in a homicide prosecution, in turn, falls under La. R.S. 14:20, the justifiable homicide statute, which provides: "A homicide is justifiable . . . (1) [w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20. *See also Rodrigue*, 98-1558, p.2, 734 So. 2d at 609 (noting that the defendant "relied on a defense of justification").

"Battered Woman's Syndrome" is an inartful (and likely outdated) term for the condition defendant claims to suffer. A 1996 report by the United States Department of Justice regarding the use of battering evidence at criminal trials states:

> Among the most notable findings was the strong consensus among the researchers, and also among the judges, prosecutors, and defense attorneys interviewed for the assessment, that the term 'battered woman syndrome' does not adequately reflect the breadth or nature of the scientific knowledge now available concerning battering and its effects. There were also concerns that the word 'syndrome' carried implications

---

[6] In this case, defendant relied on a dual theory defense of accidental discharge and self-defense. Irrespective of these alternative theories, defendant did "plead self-defense" sufficiently for the exceptions to apply here. Importantly, the domestic battery exceptions apply "when the accused pleads self-defense," not when the accused pleads *only* self-defense. *See* La.C.E. art. 404(A)(2)(a), (B)(2). Moreover, trial counsel largely minimized the accidental discharge theory, focusing primarily upon a self-defense claim in closing arguments. Nothing in the statutory language or *Rodrigue* would require us to limit the application solely to trials where there is one defense theory.

of a malady or psychological impairment and, moreover, suggested that there was a single pattern of response to battering."

Jeremy Travis, et al., U.S. Dep't of Justice, National Institute of Justice, U.S. Dep't of Health and Human Servs., and the Nat'l Institute of Mental Health, The Validity and Use of Evidence Concerning Battering and Its Effects in Criminal Trials, Foreword p. i-ii (1996). Indeed, "[m]any battered women's advocates, experts, and attorneys have expressed concern about the use of the term 'syndrome' in connection with this issue." Janet Parrish, Trend Analysis: Expert Testimony on Battering and Its Effects in Criminal Cases, Nat'l Ass'n of Women Judges, p. 2 (1996) ("Although it may have been necessary initially to use the term to demonstrate the scientific validity of the proffered expert testimony, and although it is a convenient way of describing a set of characteristics that are common to many (but not all) battered women, the use of the term 'syndrome' has also served to stigmatize the battered woman defendant or to create a false perception that she 'suffers from' a mental disease or defect (one court even referred to it as a 'malady').").[7] Nonetheless, the shorthand "BWS" will continue to be used throughout this opinion for the sake of accessibility.

**B.**

In *State v. Rodrigue*, 98-1558 (La. 4/13/99), 734 So. 2d 608, a defendant prosecuted for second degree murder sought to introduce evidence of domestic violence perpetrated by the victim against her. The Court considered and applied domestic battery evidence in the self-defense context, explaining:

> [E]vidence of a person's character generally is inadmissible to prove that the person acted in conformity with his or her character on a

_____

[7] Another notable limitation of the "Battered *Wife* Syndrome" label is obvious in the plain language of the Code articles themselves: such claims can also arise in contexts where wives abuse husbands, one same-sex spouse abuses another, parents abuse children (or vice versa), or abuse occurring in a coupled, but unmarried, context. *See* La. C.E. arts. 404(A)(2)(a), (B)(2) (indicating that such claims may arise in "a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship").

particular occasion. However, there are several specific exceptions to this general rule. With respect to evidence of the dangerous character of the victim of a crime, such evidence is admissible (1) when the accused offers appreciable evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, or (2) when the accused, ***relying on the defense of self-defense***, establishes (a) a history of assaultive behavior between the victim and the accused and (b) a familial or intimate relationship between the victim and the accused. When the latter exception has been established, the accused may offer evidence of specific instances of dangerous conduct and domestic violence without establishing a hostile demonstration or overt act by the victim.

98-1558, p.4-5, 734 So. 2d at 610-11 (emphasis added).

Because the Court applied the domestic battery exception of La. C.E. art. 404(A)(2)(a), it noted that it was "not necessary to address whether the accused presented appreciable evidence of a hostile demonstration or an overt act by the victim." *Id.*[8] In short, the *Rodrigue* defendant sought to admit the domestic battery exception evidence squarely in a self-defense claim, and the Court did not even consider that BWS must be a "mental disease or defect" and argued in a NGBRI context. *Rodrigue* indicates that this Court does not solely consider BWS to be a "mental disease or defect." Cases decided after *Rodrigue* support this interpretation. *See*, *e.g.*, *State v. Gilmore*, 16-0464 (La. App. 1 Cir. 10/27/16), 2016 WL 6330425, *writ denied*, 16-2094 (La. 9/15/17), 225 So. 3d 485 (defendant presented BWS expert without plea of NGBRI, and court of appeal found that state failed to negate self-defense claim); *State v. Taylor*, 12-0099 (La. App. 3 Cir. 11/7/12), 2012 WL 5416958 (defendant called a BWS expert at sentencing hearing for manslaughter plea in self-defense case).[9] In addition to *Rodrigue,* this Court previously provided

---

[8] *Rodrigue* turned on a different issue. The trial court rejected use of the domestic battery exception because the victim and defendant were not living in an intimate relationship at the time of the crime. The court of appeal affirmed. In reversing, this Court held that "[t]he domestic violence exception, as observed by the dissenting judge in the court of appeal, certainly did not contemplate that the battered party would not have the benefit of the provision when the batterer, as frequently happens, confronts and assaults the former mate shortly after the break-up of the intimate relationship." *Rodrigue*, 98-1558, p.7, 734 So. 2d at 612.

[9] On the other hand, most cases applying BWS in the insanity context were decided before *Rodrigue*. *See*, *e.g.*, *State v. Sepulvado*, 26,948 (La. App. 2 Cir. 5/10/95), 655 So. 2d 623, *writ*

14

guidance in dicta indicating that a BWS claim is more in line with a justification defense than an insanity defense. *See State v. Jones*, 94-0459, p. 8 (La. 7/5/94), 639 So. 2d 1144, 1150, *superseded by const'l amend. as stated in State v. Loyd*, 96-1805, p. 3 (La. 2/13/97), 689 So. 2d 1321, 1323-24 (Regarding the executive clemency power: "However, that power is also validly exercised in cases . . . where the prisoner had ***moral justification for the criminal act (such as battered women's syndrome)***, where the prisoner was not wholly at fault in committing the criminal act (such as it was committed under circumstances of insanity, mental retardation, or youth) . . . .") (emphasis added).

This Court has never held that BWS evidence is limited to the insanity context. It is not clear why the trial court and the court of appeal in this case myopically focused on trial counsel's withdrawal of the NGBRI plea and failed to review the ineffectiveness claim in the context of self-defense, the domestic battery exceptions of the Code of Evidence, and this Court's unanimous decision in *Rodrigue*.[10] To the extent it may have been unclear before, we now expressly hold that BWS evidence is admissible in a justification/self-defense case, and not solely in the insanity context.[11]

---

*denied*, 95-1437 (La. 11/13/95), 662 So. 2d 465 (defendant presented expert testimony on BWS; court of appeal found she did not prove insanity by a preponderance of the evidence); *State v. Moore*, 568 So. 2d 612 (La. App. 4 Cir. 1990) (defendant claiming BWS failed to prove she was insane at the time of the offense).

[10] *See* La. C.Cr.P. art. 651 ("When a defendant is tried upon a plea of 'not guilty,' evidence of insanity or mental defect at the time of the offense shall not be admissible.").

[11] This is in line with the interpretation of state supreme courts around the country. *See*, *e.g.*, *State v. Koss*, 551 N.E. 2d 970, 974-75 (Ohio 1990) (permitting introduction of expert evidence to support BWS self-defense claim); *Robinson v. State*, 417 S.E. 2d 88, 91 (S.C. 1992) (explaining relationship between BWS and the law of self-defense); *State v. Hickson*, 630 So. 2d 172, 174-75 (Fla. 1993) (holding that "battered spouse syndrome" expert testimony is admissible to support claim of self-defense in Florida); *State v. Borrelli*, 629 A.2d 1105, 1113 n.13 (Conn. 1993) (the expert in the case "specifically disclaimed" that BWS is "an illness or mental disorder"); *People v. Humphrey*, 921 P.2d 1 (Cal. 1996) (same); *State v. Riker*, 869 P.2d 43, 47 (Wash. 1994) ("The battered person syndrome is admitted in self-defense cases to illustrate and explain the 'reasonableness' of the defendant's actions."); *Smith v. State*, 486 S.E.2d 819, 822 (Ga. 1997) ("[E]vidence of battered person syndrome is relevant in a proper case as a component of justifiable homicide by self-defense."); *State v. B.H.*, 870 A.2d 273, 279 (N.J. 2005) ("[T]he syndrome has

## C.

Turning to the issue of expert testimony regarding BWS, we have never before limited the use of BWS self-defense testimony to lay testimony and we decline to do so here. As an initial matter, the text of the domestic battery exceptions expressly permit expert testimony "as to the effects of the prior assaultive acts on the accused's state of mind." La. C.E. arts. 404(A)(2)(a), (B)(2). *See also* Frank L. Maraist, et al., 19 La. Civ. L. Treatise, Evidence and Proof § 5.2 (2d ed.) (noting same). Moreover, expert testimony on BWS may be relevant to contextualizing testimonial and documentary evidence regarding the relationship between the victim and the defendant.[12] As the California Supreme Court has explained, "[i]t is appropriate that the jury be given a professional explanation of the battering syndrome and its effects on the woman through the use of expert testimony." *People v. Humphrey*, 921 P.2d 1, 9 (Cal. 1996) (citation omitted) (finding that any effort to distinguish the admissibility of evidence of a victim's behavior toward a defendant and expert testimony about the effects of such behavior on the defendant is "untenable"). For example:

> In many cases involving battered women, it is also necessary to bring in an expert witness to testify about battering and its effects to help jurors and judges understand the experiences, beliefs, and perceptions of women who are beaten by their intimate partners—information that the common lay person usually does not possess. Generally, in a self-defense case, this testimony is introduced to help the jurors better understand why, given this woman's experience of violence at the hands of her abuser, she was reasonable in her belief that she was in imminent danger.

---

become widely accepted as admissible evidence in self-defense cases because it has been determined to be useful in explaining conduct exhibited by battered women toward their abusers."); *State v. Urena*, 899 A.2d 1281, 1288-89 (R.I. 2006) (explaining that defense has burden to prove "the existence of battered woman's syndrome to support a claim of self-defense") (internal emphases omitted).

[12] The Legislature has decided that, if relevant, expert evidence to support a claim of self-defense in domestic battery situations is admissible. La. C.E. arts. 404(A)(2)(a), (B)(2). We express no opinion on the admissibility of expert testimony regarding other possible "syndromes" in support of a claim of self-defense.

Nat'l Ass'n of Women Judges, Moving Beyond Battered Women's Syndrome: A Guide to the Use of Expert Testimony on Battering and Its Effects," p. iv, Revised and Updated, May 1995 ("NAWJ"). As one expert noted:

> It is essential that we increase understanding in the lay and legal communities about the role of an expert in supporting established defenses used by battered women, such as self-defense. In any self-defense case, the jury needs to have information about why the defendant believed she had to defend herself—why, to use generic self-defense language, the defendant was reasonable in her belief that she was in imminent danger of death or great bodily harm. Any defendant claiming self-defense would want to bring in information about the deceased's history of violence against her or him; obviously this evidence would help the jury to better understand why the person was so afraid at the time of the incident.

*See* Parrish, *supra* at 1-2 ("Supporting the introduction of expert testimony does not promote vigilantism; it promotes fair trials. Defendants—including battered women defendants—should be able to introduce all relevant evidence at their trials, including evidence of and expert testimony about their experiences of abuse, that can help the jurors better understand their situations.").[13]

---

[13] Numerous other of our sister courts have remarked on the importance of expert evidence to contextualize lay BWS testimony in certain self-defense cases. *See*, *e.g.*, *State v. Hill*, 339 S.E. 2d 121, 122 (S.C. 1986) (BWS "is a proper subject for expert testimony" as "relevant to the issue of self-defense"); *State v. Ordway*, 619 A.2d 819, 827 (R.I. 1992) ("Battered women's syndrome is not, as yet, generally understood by the laity. Some of the jurors may have had questions why defendant did not leave the abusive relationship or attempt to defend herself against [the victim's] attacks."); *Humphrey*, 921 P.2d at 9 ("Battered woman's syndrome evidence was also relevant to defendant's credibility. It would have assisted the jury in objectively analyzing defendant's claim of self-defense by dispelling many of the commonly held misconceptions about battered women.") (internal brackets and quotation marks omitted); *State v. Townsend*, 897 A.2d 316, 327 (N.J. 2006) ("A battering relationship embodies psychological and societal features that are not well understood by lay observers and . . . these features are subject to a large group of myths and stereotypes. . . . We have no doubt that the ramifications of a battering relationship are beyond the ken of the average juror.") (internal brackets and quotation marks omitted); *State v. Koss*, 551 N.E. 2d 970, 973 (Ohio 1990) ("Expert testimony regarding the battered woman syndrome can be admitted to help the jury not only to understand the battered woman syndrome but also to determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger when considering the issue of self-defense."); *State v. Allery*, 682 P.2d 312, 316 (Wash. 1984) ("We find that expert testimony explaining why a person suffering from the battered woman syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself would be helpful to a jury in understanding a phenomenon not within the competence of an ordinary lay person . . . . This evidence may have a substantial bearing on the woman's perceptions and behavior at the time of the killing and is central to her claim of self-defense."). *See also* Erin M. Masson, *Admissibility of expert or opinion evidence of battered-woman syndrome on issue of self-defense*, 58 A.L.R. 5th 749 (1998) (collecting cases) ("Courts consistently have refused to adopt a new, independent defense based on the battered-

Expert testimony, like all other evidence, must be relevant to be admissible. La. C.E. art. 402. "Expert testimony on the subject of battered woman's syndrome is not relevant unless there is some evidentiary foundation that a party or witness to the case is a battered woman, and that party or witness has behaved in such a manner that the jury would be aided by expert testimony providing an explanation for the behavior." *State v. Borrelli*, 629 A. 2d 1105, 1115 n.15 (Conn. 1993). In this context, we otherwise decline to set rigid foundational requirements, instead leaving those to the sound discretion of the trial court on a case-by-case basis. *See State v. Altenberger*, 13-2518 (La. 4/11/14), 139 So. 3d 510, 515-16 (admissibility of evidence under C.E. art. 404 "will not be disturbed absent an abuse of discretion").

Permitting the introduction of expert testimony in a self-defense case involving BWS likewise does not alter our longstanding tenet that reasonableness is an objective standard. *State v. Guinn*, 319 So. 2d 407, 408-09 (La. 1975) ("[T]he use of force or violence is justified in self-defense only if the person reasonably believed (objective) that he was in imminent danger of losing his life or receiving great bodily harm and that deadly force was necessary to save himself."). *See also, e.g.*, *Humphrey*, 921 P.2d at 17 ("There is a clear nexus between the phenomenon of hypervigilance and the objective component of self-defense, i.e., the reasonable fear of imminent injury or death and the perceived need to react with the speed and force used."). And, though BWS expert testimony may be relevant to the defendant's credibility, *see Humphrey*, *supra*, 921 P. 2d at 9, the defendant's reasonableness remains a question for a jury. *See State v. Deshotel*, 96-0778 (La. 5/31/96), 674 So. 2d 260 ("If supported by the evidence presented at trial, the defendant is entitled to an instruction . . . that an individual is entitled to act in self-defense upon a reasonable

---

woman syndrome. Courts have, however, recognized that expert and opinion evidence regarding battered-woman syndrome, a type of post-traumatic stress disorder, can assist a jury in analyzing a claim of self-defense.").

belief that he would thereby prevent the intentional infliction of serious bodily injury to his person. The reasonableness of the accused's perception of the impending harm, as well as the reasonableness of his response, are matters exclusively for the jury.").

**D.**

Returning to the instant case, trial counsel made no investigation whatsoever into the nature of a self-defense claim predicated upon BWS evidence, much less a "reasonable investigation" as required by the Sixth Amendment. At the evidentiary hearing, counsel admitted that he was "ignoran[t]" to aspects of the BWS defense. He also "didn't know" he could introduce expert testimony with regard to BWS outside of the NGBRI context. He further testified that he did not speak with any experts about a BWS defense, and he did not request funding from the court to assist in procuring such an expert. In short, he believed a self-defense claim based on BWS was "obvious," and therefore failed entirely to investigate the proper way to defend this individual.[14]

Counsel's admitted ignorance of how to present a BWS claim, when defending a client with this particular history of abuse, was not a "reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Although counsel appears to be asserting that the "obviousness" of any self-defense claim premised upon BWS rendered further investigation unnecessary, the complicated nature of BWS itself, as set forth above, requires more informed

---

[14] Trial counsel's actions solely related to his withdrawal of the not guilty and NGBRI dual plea did not rise to the level of ineffective assistance under *Strickland*. Counsel admittedly failed to consult with defendant prior to his withdrawal of this plea, and he admittedly did not have defendant evaluated by an expert to attempt to determine her potential "insanity" at the time of the offense. We do not have to determine here whether this conduct was objectively unreasonable, because defendant has not demonstrated any prejudice under the second prong of *Strickland*. No evidence or testimony brought forth at trial—expert or otherwise—indicates that she was incapable of distinguishing right from wrong at the time of the offense. The court of appeal correctly held that this claim for relief lacked merit.

decision-making than counsel undertook. Finally, trial counsel failed to consider how expert testimony would prove helpful to defendant's case, failing to investigate any use of an expert to contextualize the vast amount of testimony regarding the abuse in this case. Based on these circumstances, we hold that trial counsel rendered deficient performance by failing to perform any reasonable investigation into how to present a BWS defense of self-defense, resulting in his unreasonable decision to view the defense as an "obvious" one with no need for even an investigation as to the benefits of an expert.

## II.

As explained above, demonstrating even professionally unreasonable conduct does not warrant the setting aside of a judgment of a criminal proceeding if the error had no effect on the judgment. *Strickland*, 466 U.S. at 691-92. Rather, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 691-92.

We find that defendant was prejudiced by counsel's conduct in this case. *Strickland*, 466 U.S. at 694 (the prejudice prong is satisfied where the defendant shows a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."). The plain language of both La. C.E. arts. 404(A)(2)(a) and 404(B)(2) provides that "an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible." And, as noted above, expert testimony could have been relevant to defendant's state of mind and the reasonableness of her actions, specifically to "help the jurors better understand why, given this woman's experience of violence at the hands of her abuser, she was reasonable in her belief that she was in imminent danger." *See*, *e.g.*, NAWJ, *supra*.

20

Expert testimony in this case might also have been relevant to whether defendant's actions warranted a conviction of manslaughter instead of second degree murder. *See State v. Lombard*, 486 So. 2d 106, 110-11 (1986) ("[T]he presence of 'sudden passion' or 'heat of blood' distinguishes manslaughter from murder. The court has stated on several occasions, however, that 'sudden passion' and 'heat of blood' are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a 'sudden passion' or 'heat of blood' is entitled to a manslaughter verdict.") (internal citations and footnotes omitted).

Because *Strickland* requires only the reasonable probability of a different result—not the reasonable probability of an acquittal—we conclude that the defendant suffered prejudice as a result of trial counsel's actions that both deprived her of her ability to present a full defense and deprived her of a credible way to mitigate the charged offense.[15] We note that this opinion does not ask or answer the question of whether, in a new trial, defendant's self-defense claim might succeed.[16]

---

[15] *See*, *e.g.*, *Paine v. Massie*, 339 F.3d 1194, 1202-04 (10th Cir. 2003) (finding ineffective assistance of counsel where counsel failed to offer expert testimony on BWS to support claim of self-defense at trial, because counsel failed to "equip the jury with an understanding of BWS" such that it could "properly assess the reasonableness of [defendant's] fear"); *United States v. Nwoye*, 824 F.3d 1129, 1139 (D.C. Cir. 2016) (finding prejudice where counsel failed to offer expert testimony on BWS, because "trial testimony strongly suggested that she had been a victim of a battering relationship" and an expert on BWS "could therefore have helped the jury assess the reasonableness of [defendant's] actions").

[16] We also note that this opinion does not alter Louisiana's jurisprudential rule prohibiting the presentation of evidence of a mental defect or disorder to demonstrate diminished responsibility or capacity that may fall short of insanity. *See State v. Jones*, 359 So.2d 95, 98 (La. 1978); *State v. Lecompte*, 371 So.2d 239, 243 (La. 1978). Under *Jones* and *Lecompte*, only a mental defect or disorder rising to the level of insanity can negate specific intent. Counsel's errors here concern only his manner of presenting the justification defense, which presupposes a specific intent to kill. Therefore, we need not address the rule espoused in *Jones* and *Lecompte*. As noted above, the term BWS, while characterized as a "syndrome," is not necessarily a mental disorder, but rather represents common effects of battering.

## <u>DECREE</u>

Pursuant to the foregoing, we hold that defendant's trial counsel was ineffective. The decision of the court of appeal is reversed. The defendant's conviction and sentence are vacated. The matter is remanded to the trial court for further proceedings consistent with this opinion, including reinstating the trial court's order granting defendant's petition for post-conviction relief and granting a new trial.

**REVERSED; CONVICTION AND SENTENCE VACATED; REMANDED.**

# SUPREME COURT OF LOUISIANA

## NO. 2016-KP-1708

## STATE OF LOUISIANA

## VERSUS

## CATINA CURLEY

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,*
*FOURTH CIRCUIT, PARISH OF ORLEANS*

**WEIMER, J.**, dissenting.

Although I very respectfully dissent from the majority's ultimate ruling, there are propositions involved in this case that must be acknowledged and from which I believe no one could reasonably disagree. Specifically, this case presents as a terrible tragedy, which is far too common. A person is dead. The defendant faces a lengthy prison term. There was evidence of domestic abuse. Such abuse is never acceptable. These propositions rightly invoke a desire to do something to change whatever can be changed in this tragic situation, but these propositions do not and cannot result in putting aside the single legal issue with which this court is now presented: whether the defendant met the substantial burden of proof imposed in her post-conviction proceeding after being convicted by a jury that heard the evidence, including the testimony of the defendant herself.

The crux of the defendant's argument is that she received ineffective assistance of counsel because her attorney failed to investigate and present an expert on domestic violence.[1]

---

[1] Like the majority and others who have written in the field, I find the term "battered women's syndrome" problematic. However, this is the term advanced in argument by the defendant, and

The law is well established that "claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." **Strickland v. Washington**, 466 U.S. 668, 693 (1984). "It is not enough for the defendant to show that [counsel's] errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In the instant post-conviction proceeding, for many reasons, the defendant never reaches the point of showing that, without counsel's alleged errors, "the result of the proceeding would have been different." *Id.* Most notably in that regard, although defense counsel called no expert on battered woman's syndrome, the jury was presented with the factual predicates from which it was free to accept or reject the theory that the defendant killed her husband as a self-defense response to being abused.

Indeed, much of the evidence presented at trial focused on the prior history of abuse inflicted upon her by her husband. While laden with potential contradictions to the self-defense theory, the defense also presented the theory that the defendant did not point the gun at her husband, but that, instead, the gun accidentally discharged and her husband was struck by the bullet after it ricocheted off the floor. From all that appears, the ricochet theory was not the product of counsel's strategy, but was presented mainly through the defendant's own trial testimony.

In stark contrast to either defense theory, the jury was presented with eyewitness testimony from the decedent's son that the defendant had not been abused and had pointed the gun at the decedent. Additionally, forensic evidence established

sometimes employed in this discussion.

that the bullet entered the decedent at an angle that was not the result of a ricochet and that, in the room where the shooting occurred, no evidence was ever found of the bullet striking anything other than the decedent.

While the defendant remained adamant that she had the gun pointed downward when it fired, the state rebutted the defendant's ricochet claim at trial by presenting testimony that a strike mark would have been visible on the vinyl tiles located in the residence where the shooting occurred. No strike marks were found. Further evidence indicated the projectile recovered from the decedent's body had only "mild deformity," that the coroner testified came from striking a single rib of the decedent, not from a ricochet. Additionally, the coroner described the bullet's trajectory as level with the floor, further undermining the defendant's ricochet theory due to an accidental discharge. In sum, the unbiased forensic evidence undermined the defendant's accidental discharge testimony. The forensic evidence was corroborated by a witness, the decedent's son, who unequivocally testified that the defendant pointed the weapon directly at her husband and then the gun "went off."

According to the court of appeal:

> [The defendant] recounted that the gun was loaded when she withdrew it from under the mattress. She denied loading the weapon and could not explain the presence of bullets on the bedroom floor when the police arrived. Also, she said she never pointed the gun at [her husband]; rather, she maintained that all the while [her husband] approached her, she kept the gun pointed at the floor. Finally, she said she received $25,000.00 in life insurance proceeds after the victim's death.

**State v. Curley**, 08-1157 (La.App. 4 Cir. 5/12/10), 2010 WL 8966072, p. 8.

The jury was also presented with testimony describing the broader context of the shooting. Notably, the defendant and the decedent had physically separated. Immediately before the shooting, two people were visiting the decedent at the former matrimonial domicile. The defendant, informed these individuals were present, went

3

to the former domicile. She was described as angry when she arrived. The defendant ordered the two visitors to leave and then the defendant and decedent began to argue.

Recalling that the defendant's post-conviction claim of ineffective assistance of counsel is predicated on her counsel's failure to present an expert on battered woman's syndrome, it is noteworthy that at least five jurisdictions have found no merit to such claims on factual grounds.[2] To prevail on a claim of ineffective assistance of counsel based on the failure to call a witness, "the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." **United States v. Fields**, 761 F.3d 443, 461 (5ᵗʰ Cir. 2014), as revised (Sept. 2, 2014) (quoting **Day v. Quarterman**, 566 F.3d 527, 538 (5ᵗʰ Cir. 2009)). Accord **State v. Jenkins**, 14-1148, p. 17 (La.App. 4 Cir. 5/6/15), 172 So.3d 27, 40 ("A petitioner, claiming that certain evidence should have been introduced or discredited, needs to attach that evidence to his application for the district court's review.").

Here, the defendant made no such showing regarding what an expert would have established to aid in her trial defense, a failure that is consistent with the defendant's inability to demonstrate prejudice under other aspects of the **Strickland** standard. Considering the defendant advanced two potentially contradictory

---

[2] See **Neelley v. State**, 642 So.2d 494, 508 (Ala. Crim. App. 1993), writ quashed as improvidently granted sub nom. **Ex parte Neelley**, 642 So.2d 510 (Ala. 1994); **People v. Moseler**, 508 N.W.2d 192, 194 (Mich. App. 1993); **People v. Rollock**, 177 A.D.2d 722, 723 (Sup. Ct. App. Div. N.Y. 1991); **State v. Coulter**, 598 N.E.2d 1324, 1330 (Ohio Ct. App. 12th Dist. 1992); **State v. Balke**, 498 N.W.2d 913 (Wis. Ct. App. 1992) (unpub'd; available at 1992 WL 437315), review denied, 501 N.W.2d 458 (Wis. 1993).

Among these, most relevant to the defendant's case here is **Balke**, in which the defendant took the position that the killing was "accidental and unintentional." *Id.* 1992 WL 437315, p. 1. Consequently, and instead of ineffective assistance of counsel, the court found the defendant in **Balke** "never laid an appropriate foundation for this evidence, failing to testify that she killed her husband as a result of prior beatings." *Id.*

explanations for the shooting (accidental gun discharge and justification from abuse), the defendant failed to demonstrate that, with the testimony of an expert on battered woman's syndrome, "there is a reasonable probability that … the result of the proceeding would have been different." **Strickland**, 466 U.S. at 694. Moreover, as this court has previously recognized, "it is not the State's burden to disprove conjectured theories of prejudice." **State v. Thomas**, 12-1410, p. 13 (La. 9/4/13), 124 So.3d 1049, 1057.

## CONCLUSION

Domestic abuse in any form is wholly unacceptable and cannot be tolerated. While the majority opinion appropriately discusses the law related to domestic abuse, the failure of proof in this case of inadequate assistance of counsel should not be overlooked. Such proof has long been a part of the law regarding when a defendant has demonstrated justification for vacating a criminal conviction and sentence.