2025 IL App (2d) 240757-U
No. 2-24-0757
Order filed September 29, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-259 |
| KYLE S. MEYER, | ) ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court did not err in denying defendant's motion to withdraw his guilty plea where his attorneys did not render ineffective assistance in relying on defendant's statements as to what potential defense witnesses would say at trial rather than interviewing them directly and the interests of justice did not otherwise warrant granting defendant's motion.

¶ 2                                    I. INTRODUCTION

¶ 3    Defendant, Kyle S. Meyer, appeals an order of the circuit court of Kendall County denying his motion to withdraw his guilty plea. For the reasons that follow, we affirm.

¶ 4                                    II. BACKGROUND

¶ 5    Defendant was charged with one count of aggravated domestic battery (strangulation), a class 2 felony (720 ILCS 5/12-3.3(a-5) (West 2020)), and one count of criminal damage to property exceeding $500, a class 4 felony (720 ILCS 5/21-1(a)(1), (d)(1)(F) (West 2020)). Defendant was initially represented by Attorney Hope Nickel and later jointly by Nickel and Attorney David Camic. On March 1, 2023, defendant entered a plea of guilty to the former charge, and the latter was nol-prossed.

¶ 6    The following transpired at the hearing at which the plea was entered. The victim first made a victim impact statement. She stated that following the incident at issue here, she would wake up crying and had "more nightmares than usual after that day." She feared leaving her house. Her friends and family had to help her through moments where she "would have flashbacks and couldn't stop from panicking or shaking." She added that she was "happy to be finally done with this and move on with [her] life."

¶ 7    The State then related the terms of the plea agreement. In exchange for his plea, defendant would serve 24 months' probation, pay a fine of $2,000, pay additional assessments totaling $749, and serve 60 days' imprisonment with work release. As part of the agreement, the count alleging criminal damage to property was to be dismissed. Defendant acknowledged that these were the terms to which he was agreeing.

¶ 8    The trial court then stated that defendant was pleading guilty to a class 2 felony, which could subject him to a prison sentence of between 3 to 7 years or 7 to 14 years if he was eligible for extended-term sentencing, 4 years of mandatory supervised release, and a fine of up to $25,000. Responding to questioning by the trial court, defendant acknowledged that he understood the nature of the charges against him and the possible penalty; that he was not required to plead guilty and could proceed to a trial, which could be a jury trial at which the State would have to prove him

guilty; and that he had certain trial rights which he was giving up. Defendant stated that he had an opportunity to discuss the plea with his attorney and that his attorney was able to "answer all [of his] questions about this decision." No one threatened him or promised him anything apart from the agreement to induce him to plead guilty. Defendant stated that he understood what the court was telling him. Defendant reiterated that he wanted to plead guilty and stated that he was doing so voluntarily.

¶ 9    The trial court then asked for the factual basis of the plea. The State explained that the victim "reported that [defendant] had attacked her." It continued, "During that time he had broken belongings in the household and at that time he had strangled her a total of four times where she had lost consciousness multiple times during the incident." Defense counsel stated, "So stipulated." The trial court inquired of defendant, "Is that what happened?" Defendant replied, "No, Your Honor, but—yes, Your Honor." The trial court inquired further, "For the purposes of this plea, you believe that's what the State's evidence would show?" Defendant answered, "Yes." The trial court then accepted defendant's plea and admonished him regarding his right to appeal.

¶ 10    On March 28, 2023, defendant filed a motion to withdraw his guilty plea and amended it on July 5, 2023. The amended motion alleged that defendant entered the plea "based upon ineffective representation and inaccurate information provided by his former counsel." Further, it alleged that defendant had "a defense worthy of a jury's consideration." Defendant asserted that his former attorneys did not adequately investigate his claim that he had acted in self-defense, despite the fact that he and his family identified a number of witnesses that would support this theory. Additionally, counsel did not allow defendant to view taped statements made by him and or the victim in this case. The amended motion further alleged that one of his attorneys "expressed to [him] that the State's Attorney of Kendall County had personal reasons not to like former

counsel, and that because of this alleged bias he did not believe that the State's Attorney would be responsive to his pleas on behalf of [defendant]; accordingly, [defendant] further felt coerced and compelled to enter a plea of guilty out of fear of reprisals against him because of his representation."

¶ 11    A hearing was held on the motion to withdraw the plea on July 10, 2023. Defendant submitted 15 affidavits from various potential witnesses. Defendant rested, and the State moved the trial court to deny the motion. The trial court denied the State's request, and the State called Attorney Nickel as its first witness. Nickel testified that she had been an attorney since 2008, spending the first five years of her career as an Assistant State's Attorney. She initially was defendant's only attorney. She received discovery from the State and reviewed it with defendant on a few occasions. Her discussions with defendant included trial strategy and a review of the strengths and weakness of the case. She reviewed physical evidence, including photographs of the victim's injuries, with defendant. Nickel testified that, in December 2021 or January 2022, she met with defendant and his mother. They "reviewed the police reports" and "watched the alleged victim's audio recorded and video recorded statement."

¶ 12    Nickel and defendant discussed the possibility of pursuing a plea agreement. She stated that she believed "defendant's decision to plead guilty was a sound legal decision" in light of "what he was hoping to accomplish" and "the evidence that was against him." She had no doubt that defendant's plea was voluntary. She explained that defendant "was very concerned about the possibility of losing his job [and] the possibility of 60 straight days in the Kendall County jail."

¶ 13    When asked whether she was "afraid of the Kendall County State's Attorneys Office," she replied, "No." Defendant ultimately received, in terms of jail time, the "minimum sentence he could." She never threatened defendant or told him that, if he did not plead guilty, "bad things

would happen to [him]."

¶ 14    Attorney Camic was brought into the case at a later point. They met with defendant jointly. Nickel testified that she was aware what a *Lynch* motion was. See *People v. Lynch*, 104 Ill. 2d 194, 200 (1984) ("We hold that when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it."). She discussed the issue with defendant. Nevertheless, she continued to believe that a guilty plea remained a "sound decision."

¶ 15    On cross-examination, Nickel agreed that she was not actually present when defendant entered his guilty plea. She last met with defendant about a month prior to the plea hearing. She did not recall if she spoke with defendant by telephone in the interim. She agreed that she spoke with defendant and his mother in December 2021 or January 2022 and that the plea hearing did not take place until March 2023. About a month prior to the plea hearing, she and Camic met with defendant and reviewed some photographs. Camic was unable to play a video, and Nickel told defendant he could come to her office to watch it. She agreed that "[t]here was a request made to watch the video, and for whatever reason, it was not accomplished." Defendant never contacted her to set up a time to watch the video. She never viewed the video with defendant; however, "the video was viewed."

¶ 16    Nickel stated that "a *Lynch* motion is a motion that can be filed if the defendant raises the affirmative defense of self-defense regarding his prior knowledge of violent tendencies of the alleged victim, or the victim's reputation for violent tendencies." In February 2023, defendant's mother, Detra Meyer, sent Nickel a list with 21 potential witnesses on it. Nickel never talked to any of them. Nickel testified that her knowledge of what these witnesses would say was limited to what defendant had told her. Defendant told her that there "was a history of the named victim

exhibiting violence on numerous occasions toward him." Nickel stated. "We talked about a *Lynch* motion, we talked about what that looked like with the witnesses, and how that would impact his case." However, Nickel pointed out, at the time defendant's mother gave her the list, defendant "had already indicated that he intended to plead guilty." The *Lynch* motion was discussed prior to defendant making this decision. Nickel "assumed what [defendant] said regarding his witnesses for the *Lynch* motion was true" and that "we would have potential witnesses for a *Lynch* motion." Because she accepted what defendant was telling her about the witnesses, she did not believe contacting them directly would cause her to have altered her advice to defendant.

¶ 17    Nickel testified that outside of defendant and the victim, there were no witnesses to the incident that resulted in the charges against defendant. The victim's injuries were consistent with "a person attacking another person as well as *** a person defending themself." Thus, the photographic evidence was not conclusive as to whether defendant attacked the victim or whether he was acting in self-defense. She agreed that she did not know any specifics regarding what the 21 witnesses would say beyond what defendant told her.

¶ 18    On redirect-examination, Nickel testified that she does not "interview all witnesses in every case when [she advises a] client." She did not interview the victim in this case or any police officers. However, she reviewed the police reports and the written and recorded statements. Her advice to defendant was based on "all that information, not one single or specific item." After discussing all of the options, including a *Lynch* motion, defendant persisted in his desire to plead guilty.

¶ 19    On recross-examination, Nickel was asked what defendant had communicated to her about the 21 witnesses. She stated:

"In our initial meeting, he informed me that he believed that he had witnesses that would

testify regarding her being violent with him, hitting him, slapping him, him having marks. I believe he also indicated the way that she would be treating him, talking to him, and that was the general scope, like general information that there was people who had witnessed physical contact from her to him."

In addition, the witnesses would be able to testify to the "general course of their relationship." She met with defendant to discuss the case at least six times.

¶ 20 Following Nickel's testimony, the hearing was continued to September 23, 2024. The State called Attorney Camic. Camic testified that he was brought into the case by Nickel "at some point later." Camic spoke with defendant prior to the entry of the guilty plea. He identified a "[p]articipation status report for an anger management class" in which defendant had participated. He later identified a letter he sent to the State regarding a psychological evaluation of defendant that had been performed. The ultimate decision of whether to go to trial belongs to the client. Camic was asked whether, when defendant asked about going to trial, Camic said, "[A]re you retarded?" Camic stated, "That's not a word I use."

¶ 21 At the time of the hearing on the motion to withdraw the plea, the State was represented by Attorney Eric Weis. Camic stated that, while he has had professional disagreements with the Weis, "Personally, we get along." In one case, Camic listed the prosecutor's wife (now ex-wife) as a witness. Camic testified that this did not cause him "concern about negotiations or discussions about this case." He noted that when he listed this witness, he "probably had another dozen felonies pending." Moreover, Weis was not initially the prosecutor in this case and the State was represented by Attorney Shlifka. In fact, Camic stated, "one of the reasons [Nickel] brought me in [was] because Mr. Shlifka and Ms. Nickel had had some antagonistic—one antagonistic case or something where [Nickel] felt she wasn't getting a fair deal and she said will you come in."

¶ 22    On cross-examination, Camic testified that he met with defendant in his office on two or three occasions. Defendant's parents attended one of those meetings. Camic recalled that during a meeting at his office, Nickel had some CDs or DVDs she wanted to play but they were unable to do so. She invited defendant to her office to view them. He would not have hesitated to contact Weis if he deemed it warranted. However, Camic acknowledged sending defendant a letter in which he wrote: "I assume Ms. Nickel, is going to attempt to speak with Mr. Weis. As you may recall, since I've listed his ex-wife as a witness, I do not believe Mr. Weis will be very responsive to me." Camic recalled discussing self-defense with defendant, though he did not recall any details. He recalled that Nickel had a list of potential witnesses that, "if she was to go to trial[,] she was going to interview that might show something." Camic agreed that a report generated by the psychologist he recommended evaluate defendant stated that the only physical encounter defendant had with the victim was when she attacked him and he pushed her away.

¶ 23    Following argument the trial court took the matter under advisement. It later issued a written ruling. In that ruling, the trial court first noted that defendant pleaded guilty on March 1, 2023, and moved to withdraw his plea on March 28, 2023. Defendant was present and represented by counsel at the plea hearing. The plea was negotiated, and defendant expressly agreed to its terms during the hearing.

¶ 24    The trial court noted that it had admonished defendant in accordance with Illinois Supreme Court Rule 402 (eff. July 1, 2012). Defendant said that he understood the charges against him and the possible penalties associated with those charges. Defendant assented when the trial court asked whether he understood that he did not have to plead guilty and that he could persist in a not guilty plea and proceed to trial. Defendant stated that he had an opportunity to discuss his decision with his attorney. Defendant further agreed that he understood that he had the right to plead guilty or

not guilty; that his attorney had been able to answer all of his questions about his decision to plead guilty; that no one threatened him or forced him to plead guilty; that no one promised him anything not expressed in the plea agreement; and that he was pleading guilty voluntarily. The trial court noted that, when asked if the factual basis set forth by the State was actually what had happened, defendant replied, "No, Your Honor, but—yes, Your Honor." Defendant agreed, however, that the evidence would show the factual basis described by the State. The trial court then accepted the plea, finding it knowing and voluntary.

¶ 25    The trial court then set forth its findings in its written order. First, it recounted Nickel's testimony at the hearing on defendant's motion to withdraw his plea. It noted that Nickel testified that she received discovery from the State and reviewed it with defendant. At "some point in 2022," Nickel met with defendant and his mother, and they reviewed a video received from the State in discovery. She discussed trial strategy with defendant. Nickel brought Camic into the case. She met with defendant and his mother at Camic's office about a month prior to the entry of the plea. Camic had difficulty playing a video, and Nickel offered defendant and his mother the opportunity to view it at her office. They never availed themselves of that offer. Defendant made the decision to accept the agreement proposed by the State.

¶ 26    The trial court observed that Nickel testified that she was familiar with a *Lynch* motion and discussed this issue with defendant. Nickel acknowledged receiving a list of 21 witnesses from defendant. She did not speak to any of them. Nickel "accepted the defendant's assurances as to what each witness would say at a hearing." She did not contact any of the witnesses because defendant decided he did not wish to proceed to trial.

¶ 27    The trial court then related Camic's testimony. Camic stated that he would have discussed the strengths and weaknesses of the case with defendant. When asked whether he asked defendant

if he was "retarded" when he expressed a desire to go to trial, Camic denied using such language. He acknowledged having professional disagreements with the State's Attorney, but denied that any of them were personal. Camic testified that he sent information regarding defendant's participation in an anger-management class and other mitigating evidence to the State. He recalled meeting with defendant on two or three occasions in his office. On one occasion, defendant's parents were present, and they had a problem playing a video. Camic did not recall making any statements indicating going to trial would be "stupid." He recalled talking about self-defense but not the victim's propensity for violence. Camic referred defendant to Dr. Timothy Brown. Camic recalled that defendant made a statement to Brown indicating that defendant had pushed the victim off him after she attacked him. Camic believed that Nickel was addressing the witness list.

¶ 28    The trial court expressly found that Nickel and Camic were credible, noting that it had an opportunity to observe their demeanor.

¶ 29    The trial court then noted that defendant submitted 15 affidavits in support of his position. The first affidavit was of defendant himself. In it, he stated that he "felt coerced and compelled to enter a plea of guilty out of fear of reprisals against him because of who was representing him." Also, "[t]he parents of the defendant also submitted their Sworn Affidavits regarding their knowledge of the defendant's interaction with his former attorneys as well as incidents in which the victim assaulted the defendant." The remainder of the affidavits "generally describe witnessing the victim striking or attacking the defendant without cause or provocation on a number of unspecified occasions."

¶ 30    After reciting the general law concerning the withdrawal of a guilty plea, the trial court stated that defendant's claims were based on (1) alleged doubt as to his guilt; (2) his assertion that he has a meritorious defense; and (3) his claim that allowing his motion would serve the ends of

justice. The trial court then noted the extensive admonishments defendant was given in accordance with Supreme Court Rule 402. In the course of these admonishments, defendant agreed, *inter alia*, that he had had an opportunity to discuss his plea with his attorney and that his attorney had answered all of his questions. He denied being coerced to plead guilty and reiterated that his plea was voluntary. Defendant stated that he understood everything that the trial court had told him.

¶ 31    The trial court acknowledged that defendant replied, "No, Your Honor, but—yes, Your Honor," when asked if the factual basis for the plea set forth by the State was "what [had] happened." It recalled, "The court did not ignore the defendant's initial response." It explained, "The court then asked the defendant a different question with respect to the State's factual basis: 'For the purposes of this plea, [do] you believe that's what the State's evidence would show?' and the defendant responded[,] 'Yes.' "

¶ 32    The trial court then found:

> "The court gave several admonitions to the defendant in order to determine whether he fully understood that he did not have to plead guilty, and whether his plea of guilty was voluntary and fully informed as a result of discussions with his attorney. At all times the defendant indicated that his plea was voluntary, that he was not forced or coerced by anyone to plead guilty, and that he had ample opportunity to discuss these matters with his attorney. The court did not ignore his initial response about the factual basis and asked a follow-up question in which the defendant acknowledged that he believed the State's evidence at trial would support the factual basis."

It noted, "As the Appellate Court previously held, a 'Defendant cannot be rewarded for ignoring the trial court's specific admonishments.' " *People v. Ferral-Mujica*, 2017 IL App (2d) 160240, ¶ 26.

¶ 33    Regarding defense counsel's effectiveness, the trial court first noted that Nickel testified that she accepted as true what defendant told her regarding what "potential witnesses would testify to at trial" and later that it was "reasonable to believe that defense counsel advised the defendant as to his various options in accordance with this information." The trial court added, "Had the defendant decided to proceed to trial, defense counsel would have been expected to speak with the potential witnesses and confirm the subject matter of their testimony; and continue to advise the defendant as to his legal options." Once defendant decided to plead guilty, neither Camic nor Nickel spoke to any of the witnesses. The trial court found, "It would be reasonable to expect them not to do so once their client made the decision to accept the State's offer and plead guilty."

¶ 34    The trial court concluded, "There is no credible evidence with respect to the claim that the defendant chose to plead guilty based on extraneous matters not related to his case." It further found, "Based on the evidence presented, the court finds that the attorneys representing the defendant at the time he entered his plea of guilty were not ineffective in their representation of the defendant by not interviewing the witnesses on the list presented by the defendant." Once defendant decided to plead guilty, the trial court explained, "there was no further need to interview potential witnesses." The trial court therefore denied defendant's request to withdraw his guilty plea. This appeal followed.

¶ 35                                    III. ANALYSIS

¶ 36    On appeal, defendant raises one main issue: whether the trial court erred in refusing to allow him to withdraw his plea of guilty. He contends that his plea was not knowingly, voluntarily, and intelligently entered because it was the product of the ineffective assistance of his attorneys. He further asserts that the "ends of justice" would be better served by allowing him to withdraw his plea. We do not find defendant's arguments persuasive; hence, we affirm.

¶ 37     To be valid, a guilty plea must be entered "voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.' " *People v. Johnson*, 2018 IL App (3d) 150679, ¶ 24 (quoting *Bradshaw v. Stumpf*, 546 U.S. 175, 183 (2005)). A defendant does not possess an unconditional right to withdraw a guilty plea; rather, a defendant must establish that a manifest injustice occurred. *People v. Baez*, 241 Ill. App. 3d 44, 110 (2011). Allowing a defendant to withdraw a guilty plea "is appropriate where the plea was entered through a misapprehension of the facts or of the law or where there is doubt as to the guilt of the accused and justice would be better served through a trial." *People v. Hughes*, 2012 IL 112817, ¶ 32. "Generally, it is within the trial court's sound discretion whether to allow a guilty plea to be withdrawn, and absent an abuse of discretion, the trial court's decision will not be overturned on review." *People v. Blankley*, 319 Ill. App. 3d 996, 1003 (2001). An abuse of discretion occurs only where no reasonable person could agree with the trial court. *People v. McNally*, 2022 IL App (2d) 180270, ¶ 30. As we note below, however, different standards apply to claims concerning the ineffectiveness of counsel.

¶ 38                    A. Ineffective Assistance of Counsel

¶ 39     We turn first to the question of whether defendant received ineffective assistance of counsel such that his plea was not voluntary or intelligent. A plea will be deemed involuntary where, in connection with the plea, counsel's assistance has been ineffective. *People v. Pugh*, 157 Ill. 2d 1, 14 (1993); see also *People v. Correa*, 108 Ill. 2d 541, 549 (1985) (quoting *McMann v. Richardson*, 397 U.S. 759, 770-71 (1970) (" 'Whether a plea of guilty is unintelligent and therefore vulnerable * * * depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but whether that advice was within the range of competence demanded of attorneys in criminal cases.' "). To establish ineffectiveness in this context, a defendant must

show "(1) counsel's performance was deficient; and (2) there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *People v. Clark*, 386 Ill. App. 3d 673, 676 (2008). "A plea based on reasonably competent advice is a voluntary plea not open to attack on the grounds that counsel erred in his judgment." *Id*. A bifurcated standard of review applies to such claims, pursuant to which we will apply the manifest-weight standard to the trial court's factual determinations while reviewing *de novo* the ultimate question of whether counsel's representation was ineffective. *People v. Presley*, 2012 IL App (2d) 100617, ¶ 24 (citing *People v. Bailey*, 375 Ill. App. 3d 1055, 1059 (2007)).

¶ 40     Here, defendant argues that trial counsels' representation was ineffective because they failed to adequately investigate his self-defense claim. It is true that "[a]ttorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *People v. Morris*, 335 Ill. App. 3d 70, 79 (2002). Indeed, "[d]efense counsel has a professional obligation, both legal and ethical, to explore and investigate a client's potential defense." *People v. Clark*, 2011 IL App (2d) 100188, ¶ 25. However, it is also true that "[c]ounsel has only a duty to make reasonable investigations or to make a reasonable decision which makes particular investigations unnecessary, and the reasonableness of a decision to investigate is assessed applying a heavy measure of deference to counsel's judgment." *People v. Pecoraro*, 175 Ill. 2d 294, 324 (1997). Defendant asserts that his trial attorneys failed to meet this obligation because neither contacted or interviewed any of the witnesses identified by him or his mother who would substantiate the victim's history of violence directed at him.

¶ 41     Nickel testified that her advice was based on an assumption that these witnesses would testify in accordance with what defendant said their testimony would be (testimony that the trial court found credible). Nickel stated that defendant told her that "he had witnesses that would testify

regarding [the victim] being violent with him, hitting him, slapping him, him having marks" as well as provide general testimony about the way the victim treated him. She did not know any specifics regarding what the witnesses would say other than what defendant related to her. She discussed a *Lynch* motion with defendant and assumed, based on what defendant had told her, that witnesses would be available to support such a motion. At the time Nickel received a list of witnesses from defendant's mother, defendant had already decided to plead guilty. Camic testified that Nickel was going to contact the witnesses if the case ended up going to trial.

¶ 42   Thus, the question before us becomes whether it was acceptable for Nickel to accept defendant's statements as true for the purpose of advising him regarding pleading guilty or whether it was necessary for her or Camic to interview the potential witnesses and ascertain what they would say in detail. We begin with the first prong of the ineffectiveness inquiry: whether defense counsel's performance was deficient. *Clark*, 386 Ill. App. 3d at 676. To prevail on this prong, a defendant must establish counsel's performance was objectively unreasonable with respect to prevailing professional norms. *People v. Colon*, 225 Ill. App. 3d 125, 135 (2007).

¶ 43   Defendant calls our attention to a number of such norms, specifically, standards articulated by the American Bar Association (ABA). See *Missouri v. Frye*, 546 U.S. 134, 145 (2012) ("Though the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides.").  Defendant points to ABA Standard 14-3.2(b), which states:

> "To aid the defendant in reaching a decision, defense counsel, *after appropriate investigation*, should advise the defendant of the alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision. Defense counsel *should not recommend to a defendant acceptance of a plea*

*unless appropriate investigation and study of the case has been completed.*" (Emphasis

added.) ABA Standards for Criminal Justice, Standard 14-3.2(b) (4th ed. 2017).

Section 14-3.2 has been cited in Illinois case law. See *Hughes*, 2012 IL 112817, ¶ 48. Defendant

also cites ABA Standard 4-4.1, which states that an attorney's duty to investigate is not terminated

by a defendant's desire to plead guilty and that "[d]efense counsel's investigative efforts should

commence promptly and should explore *appropriate* avenues that reasonably might lead to

information relevant to the merits of the matter, consequences of the criminal proceedings, and

potential dispositions and penalties." (Emphasis added.) ABA Standards for Criminal Justice,

Standard 4-4.1(b), (c) (4th ed. 2017). Similarly, Standard 4-6.2(d) states, "Defense counsel should

not recommend to a defendant acceptance of a disposition without *appropriate* investigation."

(Emphasis added.) ABA Standards for Criminal Justice, Standard 4-6.2(d) (4th ed. 2017). We have

no quarrel with this proposition generally—trial counsel undoubtedly should conduct an

*appropriate* investigation under the circumstances; however, these standards provide no guidance

regarding what constitutes an "appropriate" investigation.

¶ 44    Defendant cites Standard 4-4.3(c), which states that defense counsel "should seek to

interview all witnesses." ABA Standards for Criminal Justice, Standard 4-4.3(c) (4th ed. 2017).

We note that it does not state when such an investigation should take place, particularly whether

the investigation must be completed prior to a defendant accepting a plea offer. We also note that

this standard appears in a subsection titled "Defense Function" and another subsection exists called

"Guilty Pleas," so this standard is not necessarily applicable to the instant case. Nevertheless, we

reiterate our agreement with defendant that counsel had an obligation to conduct at least a minimal

investigation to ascertain relevant information pertaining to the guilty plea.

¶ 45    Again, the question is whether Nickel speaking with defendant and crediting what he told

her about witnesses who would testify regarding the victim's alleged history of violence toward defendant constituted an adequate investigation. Aside from the above-referenced ABA Standards, defendant calls our attention to a number of cases that he claims support his position. He first cites *People v. Domagala*, 2013 IL 113688, ¶¶ 38-40. *Domagala* did not involve a guilty plea, so the question of how much investigation is sufficient prior to the entry of a plea was not at issue there. Nevertheless, *Domagala* provides some guidance here, stating, while recognizing counsel's duty to investigate, " 'Lack of investigation is to be judged against a standard of reasonableness given all of the circumstances, "applying a heavy measure of deference to counsel's judgments." ' " *Id.* ¶ 38 (quoting *People v. Kokoraleis*, 159 Ill. 2d 325, 330 (1994) (quoting *Strickland v. Washington*, 466 U.S. 668, 691 (1984))). *Domagala* reminds us that an attorney's decision regarding how much investigation is sufficient is entitled to deference (*id.*), like any other tactical decision. See *People v. Abt*, 269 Ill. App. 3d 831, 840 (1995) ("Also, trial counsel's tactical decisions are afforded great deference on review."). Thus, both we and the trial court owe Nickel "a heavy measure of deference" regarding her decision to base her advice on defendant's representations rather than contacting witnesses directly prior to the entry of the plea.

¶ 46    Defendant also calls our attention to *People v. Bell*, 152 Ill. App. 3d 1007, 1011 (1987), which involved the failure of trial counsel to investigate *and call* several witnesses that would have testified, *inter alia*, that the victims of a murder with which the defendant was charged had "violent and sometimes explosive tempers." The *Bell* court observed, "Without having thoroughly interviewed all of the potential witnesses about the events leading up to the Bells' murders, it was impossible for counsel to determine that their testimony would have been worthless or inconsistent with the theory of self-defense." *Id.* at 1012-13. But again, this was in the context of deciding whether to present a witness at trial. *Bell* says nothing about the propriety of assuming the truth of

what a defendant represented a witness would say for the purpose of advising the defendant regarding a guilty plea. Here, Nickel testified that she made such an assumption. Thus, her advice was based on the premise that there would be witnesses to support a *Lynch* motion. It is difficult to see how confirming this assumption would have caused Nickel to render different advice.

¶ 47    *People v. Salgado*, 263 Ill. App. 3d 238, 247 (1994), also cited by defendant, holds that the failure to review a transcript of a witness's testimony, given in the trial of a codefendant, for possible impeachment material for use at trial constituted deficient performance. However, *Salgado* does not address the propriety of the sort of investigation undertaken by Nickel (that is, learning what the witness would say from defendant). It thus provides limited guidance here. *People v. Johnson*, 2019 IL App (1st) 153204, ¶ 44, which also did not involve the entry of a plea, is of similarly limited value.

¶ 48    *Clark*, 2011 IL App (2d) 100188, ¶ 14, on the other hand, did involve advice pertaining to the entry of a guilty plea. The defendant alleged that trial counsel failed to contact a witness who was willing to testify in support of an insanity defense. *Id*. In that case, "[The defendant] argue[d] that he was prejudiced by [counsel's] failure because, had he known of the potential defense, he would not have pleaded guilty and would have proceeded to trial on that defense." *Id*. *Clark* is plainly distinguishable. There, the defendant was not advised about a valid defense. Here, Nickel testified that she assumed the viability of a *Lynch* motion and that she discussed it with defendant—testimony that the trial court found credible. As such, unlike the defendant in *Clark*, defendant was aware of and advised regarding the defense he now seeks to rely on in arguing that trial counsel was ineffective.

¶ 49    Defendant also cites two foreign cases involving the effectiveness of counsel relative to guilty pleas: *Commonwealth v. Fultz*, 316 Pa. Super. 260 (Pa. Super. Ct. 1983), and *State v. Curley*,

250 So.3d 236 (La. Sup. Ct. 2018). *Fultz* is easily distinguishable, in that the *Fultz* court held trial counsel was ineffective for failing "to interview witnesses or investigate and discuss with appellant the possibility of raising the question of the incompetency of the infant witness/prosecutor." *Fultz*, 316 Pa. Super. at 272. Unlike counsel in *Fultz* who did not discuss a possible defense with their client, Nickel discussed the possibility of a *Lynch* motion with defendant based on defendant's representations regarding what the witnesses would say. *Curley* is also distinguishable. In that case, "trial counsel made no investigation whatsoever into the nature of a self-defense claim predicated upon [Battered Woman Syndrome] evidence, much less a 'reasonable investigation' as required by the Sixth Amendment." The trial attorney in *Curley* "admitted that he was 'ignoran[t] to aspects of the [Battered Woman Syndrome] defense." Conversely, Nickel testified that she was aware what a *Lynch* motion was. Thus, the sort of omission described in *Curley* is absent in this case.

¶ 50    Having reviewed the cases submitted by defendant in support of his position, we are not persuaded that he has established that trial counsel was deficient in relying on his representations regarding what witnesses would say rather than interviewing the potential witnesses directly. We emphasize that this holding is limited to the context of the entry of a guilty plea. Having concluded that defendant failed to show counsel's performance was deficient, we need not address whether that conduct was prejudicial to defendant. See *People v. Shelton*, 401 Ill. App. 3d 564, 584 (2010) ("In view of our disposition of the first prong of the *Strickland* analysis, we need not address whether defendant suffered prejudice as a result of defense counsel's alleged deficiencies.").

¶ 51    Before closing, we must address one additional point raised by defendant. Defendant asserts that had counsel conducted a more vigorous investigation, they would have learned additional information not related to them by defendant about what the witnesses would say. Most

significantly, one potential witness averred that the victim "admitted that she was not choked by [defendant] but only fabricated the allegation of [defendant] choking her on the advice of her father, who hated [defendant] and was a police officer." Initially, we note that such testimony would have been inconsistent with defendant's self-defense theory, which would have required defendant to admit the crime with which he was charged. See *People v. Taylor*, 2023 IL App (4th) 220381, ¶ 59. Moreover, while this would seem to constitute strong impeachment evidence, counsel's performance cannot be evaluated with the benefit of hindsight. See *People v. Perry*, 224 Ill. 2d 312, 344 (2007) ("We have also made it clear that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight."); *People v. King*, 316 Ill. App. 3d 901, 913 (2000) ("In assessing such a claim, the court must give deference to counsel's conduct within the context of trial and without the benefit of hindsight."). What might have been discovered may very well be relevant to the prejudice prong; however, we are not reaching the question of prejudice. Defendant has not convinced us that counsel's decision to rely on his representations constituted deficient performance.

¶ 52    In short, defendant has not established that trial counsel was constitutionally ineffective.

¶ 53                               B. The Interests of Justice

¶ 54    Defendant also contends that the ends of justice would be best served by allowing him to withdraw his guilty plea. Defendant cites the following passage from our supreme court:

> " 'Where it appears that the plea of guilty was entered on a misapprehension of the facts or
>
> of the law, or in consequence of misrepresentations by counsel or the State's Attorney or
>
> someone else in authority, or the case is one where there is doubt of the guilt of the accused,
>
> or where the accused has a defense worthy of consideration by a jury, or where the ends of

justice will be better served by submitting the case to a jury, the court should permit the withdrawal of the plea of guilty and allow the accused to plead not guilty.' " *People v. Davis*, 145 Ill. 2d 240, 244 (1991) (quoting *People v. Morreale*, 412 Ill. 428, 531-32 (1952)).

It further stated, "[I]t is within the sound discretion of the trial court to determine whether a guilty plea may be withdrawn." *Id*. Hence, we will not disturb the trial court's judgment absent an abuse of that discretion. *Hughes*, 2012 IL 112817, ¶ 32; *Blankley*, 319 Ill. App. 3d at 1003. An abuse of discretion occurs only if no reasonable person could agree with the result reached by the trial court. *McNally*, 2022 IL App (2d) 180270, ¶ 30. Thus, it is defendant's burden to show that no reasonable person could agree that he was not entitled to withdraw his plea of guilty.

¶ 55    Defendant argues that a number of the considerations articulated in *Davis* militate in favor of allowing him to withdraw his plea. He asserts that he did not receive the informed advice of counsel; that he had a strong defense to the charges that should have been considered by a jury; that there is "ample doubt as to his guilt"; and that the interests of justice would be served by allowing him to withdraw his plea. Defendant contends that "all the above elements" articulated in *Davis* "are in play and require a reversal of the trial court's denial of the amended motion to withdraw the plea." However, we note that defendant does not assert that he was proceeding under a misunderstanding of the facts or the law. We will examine these contentions individually.

¶ 56    First, defendant asserts that he did not receive "the informed advice of competent counsel prior to his plea." However, in the previous section of this disposition, we rejected defendant's claim that trial counsel was ineffective in connection with the entry of his guilty plea. We therefore conclude that a reasonable person could determine that this consideration does not weigh in favor of allowing defendant to withdraw his plea.

¶ 57　Second, defendant asserts that he has a strong defense to the charges that should have been presented to a jury. Although the conditions warranting the grant of a motion to withdraw a guilty plea are presented disjunctively in *Davis*, 145 Ill. 2d at 244, it has been held that, "[w]hile having a defense worthy of consideration may be a significant element of a motion to withdraw a guilty plea, it is, standing alone, not a sufficient element." *People v. Carlson*, 179 Ill. App. 3d 1050, 1055 (1989); see also *People v. Horrell*, 2022 IL App (3d) 200417-U, ¶ 31. Thus, assuming, *arguendo*, that defendant has a strong defense to the charges against him, he would also need to show that he was acting under a misapprehension of fact or law. See *Carlson*, 179 Ill. App. 3d at 1054-55; see also *Horrell*, 2022 IL App (3d) 200417-U, ¶ 31 ("Besides having a 'defense worthy of consideration,' [a] defendant must also show he was under a misapprehension of fact or law when entering into his guilty plea." (citing *People v. King*, 1 Ill. 2d 496, 501 (1953); *People v. Cosby*, 137 Ill. App. 3d 854, 856 (1985)).

¶ 58　Defendant asserts that he would have been able to present a significant number of witnesses that would testify to the victim's history of violence toward him. This would have aided him in establishing that the victim attacked him and that he was acting in self-defense. See *Lynch*, 104 Ill. 2d at 200; see also *People v. Figueroa*, 381 Ill. App. 3d 828, 841 (2008) ("*Lynch* provides the seminal law regarding the admissibility of character evidence in cases where self-defense has been raised."). Having reviewed the affidavits, it does indeed appear that defendant could have raised a credible claim of self-defense.

¶ 59　However, it is also true that defendant was aware of these witnesses at the time he pleaded guilty. It was defendant and his mother that told defense counsel about these witnesses. During admonishments, defendant stated that he had had an opportunity to discuss the case with his attorneys and that they had answered "all his questions about" his decision to plead guilty.

Defendant was admonished and indicated that he understood that he was giving up his right to a trial and that, at a trial, he could confront and cross-examine witnesses as well as present witnesses on his own behalf. Nickel testified that she discussed a *Lynch* motion with defendant.

¶ 60    In *Cosby*, 137 Ill. App. 3d at 855, the defendant was charged with aggravated criminal sexual abuse (Ill. Rev. Stat. 1984 Supp., ch. 38, par. 12-16(b)). The statute defining the crime to which the defendant pleaded guilty made it a defense that the defendant reasonably believed the victim was over the age of 15. *Id.* at 859. The defendant did not understand this principle. *Id.* at 860. The *Cosby* court found that this constituted a misapprehension of law sufficient to warrant allowing the defendant to withdraw his guilty plea. *Id.*

¶ 61    *Cosby* is distinguishable from *Carlson* in a manner relevant to this case. In *Carlson*, 179 Ill. App. 3d at 1050-51, the defendant pleaded guilty but mentally ill to charges of murder and attempted murder. The defendant moved to withdraw her plea, asserting that she had a defense worthy of consideration, specifically, insanity. The *Carlson* court noted that the record showed that defense counsel had "thoroughly explained the potential defense of insanity to the defendant." *Id.* at 1054. Discussing *Cosby*, it observed that "[t]he defendant in *Cosby* was under the misapprehension of law that his mistaken belief as to the victim's age was not a defense to the charge of aggravated criminal sexual assault." *Id.* The *Carlson* court stated that, unlike *Cosby*, "the defendant fully understood the options available to her and voluntarily chose to plead guilty but mentally ill." *Id.* It rejected the claim that the defendant in the case before it "entered a plea of guilty under a misapprehension of the law of insanity." *Id.* at 1055.

¶ 62    This case is similar to *Carlson*. As noted, like *Carlson* and unlike *Cosby*, Nickel stated that she explained a *Lynch* motion to defendant and defendant told the trial court that he had had an opportunity to speak with his attorneys and that they had answered all of his questions. Like the

defendant in *Carlson*, defendant pleaded guilty after being adequately informed about the possible defense upon which he now seeks to base his request to withdraw his plea. Thus, as in *Carlson*, the existence of this potential defense of which defendant was aware is not a basis upon which defendant is entitled to withdraw his plea. Parenthetically, we note that defendant does not suggest that he had a defense to the charge of criminal damage to property, which was nol-prossed.

¶ 63    Third, defendant also contends that there is sufficient doubt regarding his guilt to warrant withdrawing his plea. We have already addressed defendant's self-defense claim and will not do so again at this point. Pertinent here, however, is the affidavit of one of the witnesses averring that the victim told her "that she was not choked by [defendant] but only fabricated the allegation of [defendant] choking her on the advice of her father, who hated [defendant] and was a police officer." In *People v. Thurmond*, 262 Ill. App. 3d 200, 204 (1994), this court held, "[T]he voluntariness of the plea was not negated by counsel's subsequent discovery of a witness who would allegedly contradict part of the State's case."

¶ 64    Further, in *People v. Mercado*, 356 Ill. App. 3d 487, 494 (2005), the court stated, "It is well settled that a defendant may not withdraw his guilty plea if he has misjudged the strength of the State's case." The statement the affidavit attributes to the victim, if believed, could be used to impeach the victim. See *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 38. However, impeachment affects the weight of testimony. *People v. Munguia*, 33 Ill. App. 3d 880, 884 (1975) ("Since we find the impeachment of [the witness], which included impeachment by the use of prior statements, to have been proper, we also find no error in instructing the jury that such evidence may affect the weight to be accorded the witness' testimony."). As such, it goes to the strength of the State's case, the miscalculation of which is not a basis to allow defendant to withdraw his plea. *Mercado*, 356 Ill. App. 3d at 494.

¶ 65    Defendant also points out that, during an interview, he told a psychologist that "the only physical encounter that he ever had with the named victim was when she had, for lack of a better term, attacked him and then he had—she would not let him get up and he had pushed her off, and that that was the only encounter that they had ever had." It is not clear that this evidence would even be admissible. Generally, prior consistent statements "are admissible in only two circumstances: (1) where there is a charge that the witness has recently fabricated the testimony, or (2) where the witness has a motive to testify falsely." *People v. McWhite*, 399 Ill. App. 3d 637, 641 (2010). Defendant does not suggest either of these conditions exist here. Hence, it is not apparent to us why this information would affect defendant's decision to plead guilty.

¶ 66    Fourth and finally, *Davis*, 145 Ill. 2d at 244, includes "where the ends of justice will be better served by submitting the case to a jury" as a basis for permitting the withdrawal of a guilty plea. This final provision is broadly worded and thus allows a court to consider whatever factors affect reaching a just outcome. *Cf. Bremel v. Quedas, Inc.*, 2024 IL App (1st) 231209, ¶ 37 ("The 'catch-all' provision of section 8(a)(3)(C) permitting the trial court to award 'any other relief the circumstance may require' (740 ILCS 160/8(a)(3)(C) (West 2014)) is broad, allowing the court considerable discretion in fashioning an appropriate remedy based on the particular circumstances before it."). We will not revisit all of the factors discussed above; however, defendant raises a few, general points that we will address here.

¶ 67    First, defendant points out his equivocal response when asked if the factual basis set forth by the State was what actually had transpired. Defendant answered, "No, Your Honor, but—yes, Your Honor." The trial court then inquired further, "For the purposes of this plea, you believe that's what the State's evidence would show?" Defendant responded, "Yes." Our supreme court has explained that "[t]he factual basis for a guilty plea generally will consist of an express

admission by the defendant that he committed the acts alleged in the indictment or a recital to the court of the evidence that supports the allegations in the indictment." *People v. White*, 2011 IL 109616, ¶ 17. Thus, a defendant need not make an admission that he committed the crime for a guilty plea to be valid. *People v. Brazee*, 316 Ill. App. 3d 1230, 1236 (2000) ("Nevertheless, the factual basis will be established as long as there is a basis anywhere in the record up to the final judgment from which the judge could reasonably reach the conclusion that the defendant actually committed the acts with the intent, if any, required to constitute the offense to which he is pleading guilty."). Defendant does not suggest that a factual basis for his plea was lacking. Accordingly, his equivocation is immaterial here.

¶ 68   Second, defendant complains that his attorneys did not facilitate his viewing of a videotaped recording of the victim's statement. Nickel, however, testified that she met with defendant and his mother in December 2021 or January 2022 and they "reviewed the police reports" and "watched the alleged victim's audio recorded and video recorded statement." Camic recalled having difficulty playing a recording during a meeting at his office. Nickel invited defendant to her office to view them. Nickel testified that defendant never availed himself of this offer. The trial court found the testimony of Nickel and Camic credible, and defendant does not explain why this finding is contrary to the manifest weight of the evidence. Thus, defendant's claim is ill founded.

¶ 69   Third, defendant asserts that the allegedly hostile relationship between Camic and State's Attorney Weis affected his decision to accept the plea. He points to a letter from Camic that stated, "I assume Ms. Nickel, is going to attempt to speak with Mr. Weis. As you may recall, since I've listed his ex-wife as a witness, I do not believe Mr. Weis will be very responsive to me." We note that this communication references Nickel speaking with Weis rather than Camic, so a reasonable

person could conclude that, even if it existed, the acrimonious relationship between Camic and Weis would not have affected this case. Moreover, Camic, whom the trial court found credible, also testified that he and Weis got along personally and that he would not have hesitated to contact Weis if it had been necessary. We can find no abuse of discretion in the denial of defendant's request to withdraw his plea based on this purported relationship.

¶ 70 To conclude, defendant has not convinced us that no reasonable person could agree that his request to withdraw his plea should have been denied.

¶ 71                                IV. CONCLUSION

¶ 72 In light of the foregoing, the judgment of the circuit court of Kendall County is affirmed.

¶ 73 Affirmed.